In re VICKSBURG BRIDGE & TERMINAL CO., Inc.

Nos. 1236, 1237.

District Court, S. D. Mississippi, Western Division.

Sept. 28, 1938.

Supplemental Opinion Nov. 9, 1938.

230

Sidley, McPherson, Austin & Burgess, of Chicago, Ill., May & Bird of Jackson, Miss., Monroe & Lemann, of New Orleans, La., Dufour, St. Paul, Levy & Miceli, of New Orleans, La., Hudson, Potts, Bernstein & Snellings, of Monroe, La., Green, Green & Jackson, of Jackson, Miss., G. Garland Lyell, of Jackson, Miss., Engle & Laub, of Natchez, Miss., David M. Proctor, of Kansas City, Mo., Brunini & Hirsch, of Vicksburg, Miss., Coudert Bros., of New York City, Mayer, Mayer, Austrian & Platt, of Chicago, Ill., Wells, Wells & Lipscomb, of Jackson, Miss., and C. T. Munholland, of Monroe La., for creditors.

Watkins, Watkins & Eager, of Jackson, Miss., and Sholars & Gunby, of Monroe, La., for trustees.

DAWKINS, District Judge.

This matter has now to be considered on the application of a large number of committees, attorneys and other persons for payment of expenses alleged to have been incurred for the benefit of the estate, and also for fees or compensation for services claimed to have been rendered. The names

of the persons and amounts claimed are as follows:

| | Expenses | Compensation |
|---|---|---|
| Chicago Bondholders' Committee | $ 48,566.09 | |
| Attorneys for Chicago Com. | | $ 85,000.00 |
| R. Miles Warner, Sec'y | 6,312.50 | 18,750.00 |
| Lambert & Hart, Attorneys | 33.85 | 500.00 |
| City National Bank, Depositary | 8,638.58 | |
| New York-Vicksburg Com. | 25,163.17 | |
| Jos. M. Mulford, Sec'y | 243.26 | 7,500.00 |
| Attorneys for this Com.: | | |
| Coudert Bros. | 180.61 | 30,000.00 |
| Fred Esch | 187.97 | 2,950.00 |
| Alvin T. Sappingsley | 79.07 | 2,500.00 |
| May & Bird and Lyell & Lyell | | 60,000.00 |
| F. H. Andrews, Sec'y | | 12,500.00 |
| Members New York-V'burg Com.: | | |
| C. L. Warner | | 2,500.00 |
| George M. Sudduth | | 6,000.00 |
| Lloyd S. Carter | 174.00 | 4,000.00 |
| Robert M. Nelson | | 4,000.00 |
| Milton W. Harrison | | 6,000.00 |
| A. W. Porter, Inc. | 385.00 | |
| Marine Midland Trust Co., Depositary | 683.50 | |
| Merchants National Bank, Depositary | 297.00 | |
| Independent Debentureholders' Com. of Kansas City, Mo. | 9,101.69 | 39,580.00 |
| First Nat'l Bank of K. City, Depos. | 4,666.86 | |
| Attorneys K. C. Deb. Com. (David M. Proctor, C. T. Munholland and Charles M. Blackmar) | | 60,000.00 |
| Ryland Stinson, Mag & Thompson, Depository Attorneys | | 2,000.00 |
| Brady, Hanser & Thompson | 2,266.22 | 15,000.00 |
| Attorneys for Brady, et al (Levy, Wells & Engle) | 2,259.58 | 30,000.00 |
| Financial Adjustment Committee | 4,738.53 | 1,175.00 |
| Harry P. Schaub | 690.89 | 2,500.00 |
| Frank A. Dunnegan | 205.66 | |
| Continental Illinois Bank & Trust Company, original trustee, and counsel Meyer, Meyer, Austrian & Platt and Green, Green & Jackson, Trustee counsel | 2,472.73 | 10,000.00 |
| Counsel | | 25,000.00 |
| H. C. McCabe, Special Master | 37.73 | 5,000.00 |
| Thomas W. McCoy, Individual Trustee | | 2,500.00 |
| R. L. Dent, local counsel for Trustee | | 2,500.00 |
| Engle & Laub and Brunini & Hirsch Placing Debtor in voluntary bankruptcy | | 10,000.00 |
| Brunini & Hirsch | | 15,000.00 |
| Flowers, Brown & Hester, Attorneys for Debtor | | 8,500.00 |
| Totals | $117,384.49 | $470,955.00 |

This case originated as an application by certain debenture holders for the appointment of receivers for the Vicksburg Bridge & Terminal Company, filed in the Western District of Louisiana, on January 30, 1934. Jurisdiction was claimed, first, on the theory that the debentures enjoyed a lien upon the property and revenues of the Bridge Company; and second, because the company appeared simultaneously, admitted its insolvency, inability to pay debts, and expressed its willingness that receivers be appointed on those grounds. It appeared that the Bridge Company had neither its domicile nor its place of business in the Western District of Louisiana, although about two-thirds of the bridge structure and land on which it rests were situated in said district. In those circumstances, the judge (the author of this opinion) first entertained doubt as to whether jurisdiction in said district, either of the corporation or in equity, existed, but after extended examination of the law concluded that, while the debentures carried no lien, as such, the answer of the Bridge Company created a situation equivalent to a common law lien on a return nulla bona under an ordinary judgment, which would sustain the exercise of its equity powers in appointing receivers. Accordingly, the then President of the Company, who up to that time had been unknown to the court, with Thos. S. Sholars, who had served satisfactorily in other similar matters, were appointed receivers and at the same time the court appointed as attorneys for the receivers Sholars & Gunby, a law firm in the City of Monroe, who had appeared for the petitioning debenture holders. On the next day an identical petition was filed in the Southern District of Mississippi and the same persons were appointed as receivers there.

Within a few days, motions to vacate the orders appointing receivers and attorneys were filed by a group of bondholders and others, in which charges of bad faith, etc., were made against the then President of the Company and his associates in bringing about said appointments. About the same time, petitions for involuntary adjudication in bankruptcy were filed on behalf of other debenture holders at the domicile of the Bridge Company in Delaware, in the Southern District of Mississippi, and in the Western District of Louisiana. Shortly thereafter, there was also filed on behalf of the Bridge Company in the

232

Southern District of Mississippi an application for voluntary adjudication, and the referee there adjudged the Bridge Company a voluntary bankrupt.

The first hearing upon any of these matters was had at Monroe, in the Western District of Louisiana, early in April, 1934. In the meantime, the co-receiver, Thos. S. Sholars, had died, and the court becoming convinced, after partial hearing and taking of testimony, that there was little difference between the parties as to the necessity for receivers, but that the principal contention was as to their personnel, and in view of the condition of a wooden trestle of some 1,100 feet forming the western approach of the bridge, which required immediate attention, the matter should be promptly acted upon, the Judge brought about an adjustment which resulted in the appointment of Kenyon D. Wells of Vicksburg as co-receiver, in place of Sholars, deceased, and steps were promptly taken for replacing the western approach with concrete and steel. This work required several months.

After the amendment to the Bankruptcy Act, commonly known as Section 77B, 11 U.S.C.A. § 207, in the late spring or early summer of 1934, application was made in the name of the Bridge Company for reorganization under its provisions. In the meantime, the annual stockholders' election had been held and control of the corporation had passed out of the hands of the former President, Harry E. Bovay and his associates, into those of John J. Shinners and associates (the latter holding about two-thirds of the common stock as against one-third by the former). There was also submitted with the petition for relief under Section 77B, a plan of reorganization, which, in substance, provided for the creation of a new corporation, the stock of which was to be divided, 75% to the bondholders and 25% to debenture holders. The bondholders were also to receive new first mortgage bonds for the full amount of their claims. It also contemplated the elimination of all stock of the old company because of insolvency.

While this was going on, two committees for bondholders had been formed, one headed by the said John J. Shinners, styled "The Protective Committee for Vicksburg Bridge & Terminal Company First Mortgage 6% Sinking Fund Gold Bonds" (hereinafter called the Chicago, or Shinners Committee) and the other under the name of "Independent Bondholders' Committee of the Vicksburg Bridge & Terminal Company" formed by Milton W. Harrison and associates (hereinafter called the New York-Vicksburg, or Harrison Committee).

There had been previously formed in the latter part of 1932 a committee styled "The Financial Adjustment Committee for 7% Gold Debentures of the Vicksburg Bridge & Terminal Company", headed by Mord M. Bogie (hereinafter called the Bogie Committee). This committee had been created at the instance of the officers of the Bridge Company (particularly Shinners and Bovay, who were managing the business) for the purpose of getting in hand and controlling the debentures upon which interest payments had or were about to be defaulted, and to prevent receivership from that source. Bogie was an employee of H. M. Byllesby & Company, of which Shinners was Vice-President, and another member, Harold W. Beacom, of the law firm of Winston, Strawn & Shaw, had acted as attorney for the Bridge Company from its formation. This committee had succeeded in collecting $1,400,000 of the original issue of $2,000,000 of debentures, and had joined the Bridge Company, or at least indicated its approval, in proposing the plan for the distribution of securities in the manner above stated; that is, the giving to debentures 25% of the common stock of the company.

On the other hand, the Harrison Committee, which had registered with the Trade Commission under the Securities Act, appeared and opposed the application of the Bridge Company (which was sponsored by the same group which represented the Chicago Bondholders' Committee throughout) and itself submitted a plan which eliminated from participation, not only the common stock of the old company, but likewise all debentures.

At the first hearing in Monroe in April, 1934, David M. Proctor, an attorney, and C. L. Fontaine, both of Kansas City, Missouri, appeared on behalf of a group of debenture holders, who at that time held less than $100,000 of this class of securities. Later, what has been referred to as the Kansas City Debenture Holders' Committee, with Fontaine as chairman, was formed. As previously stated, the Bogie Committee chairman and its attorney continued to appear until it subsequently dissolved under circumstances which will later be discussed. Practically all of

the attorneys now seeking compensation, with a large number of individuals who were or have become members of committees, or have associated themselves with various groups seeking allowances of compensation and expenses, were likewise present from the beginning, except the law firms of Monroe & Lemann, for bondholders, Calvin Wells, III, and Dufour, St. Paul, Levy & Miceli, who later appeared and sought to represent another group of debenture holders. Hence, from the inception, there were an extraordinarily large number of persons seeking to participate in the proceedings from many different angles, and practically all of them would appear on each occasion when there was anything of consequence to be considered by the court. None of the individuals who appeared as plaintiffs, in filing the original application for receivers and the involuntary petitions in bankruptcy, so far as the court is advised, ever became serious contenders in any of the controversies that subsequently arose; and I think the record fairly reflects the idea that they were used merely as pawns by the real parties to the litigation at its commencement. These adverse groups in the early stages were headed on the one side by John J. Shinners, and on the other by Harry E. Bovay, and while the involuntary proceedings were prepared by and filed at the instance of Harold W. Beacom, counsel for and a member of the Bogie Committee, this was simply a part of the strategy at the beginning to meet the action of Bovay in petitioning for the appointment of receivers, and the latter in turn caused the application for voluntary adjudication to be filed to checkmate what Beacom on behalf of the Chicago group had done.

It became apparent to the court at the first hearing in April, 1934, that the principal controversy with which it would ultimately be confronted was one between bondholders and debenture holders. It also soon appeared that the Bridge Company was insolvent, and further, that the stock was what is usually termed bonus stock, nothing other than the original $1,000 subscribed to qualify under the Delaware law, having been paid in, and the bridge was built entirely from the proceeds of the bonds and debentures. The only possible consideration for the stock otherwise was such value as might have been due to the permit, or as it is sometimes called the franchise by Congress, to construct the bridge across the Mississippi river.

The record of that hearing will show that at the time, the court called attention to this conflict of interests between the group of bondholders, headed by Shinners, Vice-President of Byllesby & Company, and the Debenture Holders' Committee, of which Bogie, an employee of Byllesby & Company, was chairman. It also, in no uncertain terms, in the course of this first hearing, informed these groups that they would have to be divorced and proper representation provided for the debentureholders, who held no lien on the Bridge Company's property. However, notwithstanding this clear statement by the court, Bogie and his associates persisted in their attempt to represent this large majority of the total debentures, which was more than sufficient to approve or reject any plan of reorganization, until sometime in June, 1935. In the meantime, the court had appointed a master and instructed him to make a thorough investigation of the history of the Bridge Company and the activity of its officers, with directions to go to Chicago, where the books, records, etc., were kept, and the parties composing these two interests (bond and debenture representatives) resided, to develop fully their relationships to each other. It had indicated that, unless there was a voluntary separation which would afford proper representation for this large group of debentures, it would, if the facts developed by the master justified, remove the members of the Bogie Committee. Before the hearing in Chicago was held, Mr. Beacom and Mr. Bogie came to Shreveport, where the judge was sitting, and tendered their resignations. It then became necessary that these debentures which had been collected by the Bogie Committee in a Chicago bank should be furnished effective representation. There was nothing in the deposit agreement which they had used that authorized the substitution or change of personnel of the Bogie Committee,—in fact, it did not give them the power to approve a plan of reorganization. A rather awkward situation was thus created. To have the depositary bank return the securities to the owners and leave them to their own resources in organizing a representative committee seemed to the court unfair and at least uncertain, in so far as prompt action was concerned. Therefore, of its own

motion, the court determined to appoint an independent and experienced agent, having no previous connection with the matter, and named Charles de.B. Claiborne, Vice-President of the Whitney National Bank in New Orleans, as a special trustee, or agent to represent this group of debenture holders. There was also prepared a form of power of attorney, in general terms authorizing him to represent them in all proceedings, including the voting upon plans of reorganization, and providing that his compensation should be whatever the court found reasonable. Byllesby & Company held in its possession the only list of these security holders and their addresses, and were required to furnish that information to Claiborne. However, after more than a year's efforts, he succeeded in obtaining powers of attorney from less than $400,000 of the $1,400,000 thus situated. This condition continued, notwithstanding the court finally had sent to this group of security holders, over the signature of the clerk of court, a statement confirming Claiborne's official status, and the authority under which he was acting. Unfortunately, Mr. Claiborne died with that condition remaining. The court, naturally, experienced difficulty in understanding this inertia on the part of debenture holders, and suspected possible interference. But it must be remembered that when the property was taken in hand about the first of February, 1934, the bonds were quoted on the market at from $18 to $20 on the $100 and the debentures from $1 to $3, so that these circumstances may have had something to do with the matter. There is also the fact that Byllesby & Company had floated both classes of securities and there was, at least at that time, a tendency on the part of investors to look to the banking concerns, from whom they had bought, for advice in a situation of this kind, and in justice to Byllesby & Company it is well to note that the court had, by special order, prohibited all committees and others from seeking to represent either class or communicating with them until it had approved the deposit agreements which had been submitted early in 1935.

While Claiborne was attempting to act for debenture holders, conferences were held between him and the representatives of the Shinners' Committee, principally Mr. Shinners and his counsel, Mr. Oates and Mr. Hudson at that time, but nothing was accomplished. Concurrently, Messrs. Fontaine and Proctor had been appearing for their group of debenture holders on each occasion when matters of importance were to be considered by the court. This was also true of members of the Harrison Committee or New York-Vicksburg Committee and their counsel both from Mississippi and New York, as well as the attorneys from Chicago and Mississippi, appearing for the original bond trustees. Attorneys for stockholders, the debtor and one individual claimant for legal services, likewise appeared. The result was a small convention each time there was a hearing.

The master, who had been appointed in the spring of 1935, went to Chicago in the late summer or early fall, and spent some three weeks taking testimony covering all phases of the matter, and at which hearing most of the same groups appeared. The master died shortly after his return, before having an opportunity to prepare a report, and the court was compelled, with the aid of one of the attorneys for the trustees in reorganization who had prepared an extensive summary with page reference, to study this evidence to acquaint itself with the material facts developed in Chicago. However, its examination was of considerable assistance in dealing with the problems of the estate which subsequently arose.

Early in February, 1936, the Judge became ill and was unable for several months to give any attention to business, but after recovering sufficiently to do so, summoned the attorneys representing the various groups to his chambers in Monroe, with the express suggestion that the numerous other persons, such as members of committees and individuals who had uniformly attended, need not be present. At this conference, which was attended by the attorneys for the two bondholders' committees (Shinners and Harrison), the Kansas City Debenture Committee, attorneys for the trustees, etc., the court requested that serious effort be made to reach a basis of adjustment between the two classes of security holders, bonds and debentures, and indicated that this might be accomplished through a cash settlement, which would entirely eliminate the latter and permit a reorganization, in which the bondholders would receive substantial amounts of money, new bonds and all the stock of a new corporation. Negotiations were carried on for some two days, at the end of which time the court was informed that substan-

tial progress had been made, but that it had become necessary for counsel to consult further with their clients, after which report would be made back to the court. The attorneys returned to their homes, and several weeks passed without further information. Upon inquiry, the court was advised that a stalemate had been reached, the causes for which and attitudes of the parties in respect thereto it is unnecessary to detail here. As soon as a convenient time could be found, in view of the heavy demands in the judge's own district, he sent out notice to all persons and their attorneys of record up to that time, that on January 20, 1937, a hearing would be held in Vicksburg, at which, if the parties were unable to agree upon the basis of a plan to be submitted, the court would itself attempt to suggest a formula. In the meantime, the court had purposely refused to release the committees and others from the effects of an order which had prohibited everyone from soliciting deposits of securities until something tangible had been worked out. There were several reasons for this, but it is only necessary to mention the more important ones. The members of the Shinners or Chicago Committee had under their control a substantial block of bonds, and also the very great advantage of its relationship with Byllesby & Company, who had sold both classes of securities originally, which, it was believed, would enable them to get control and more or less dictate terms. The judge felt that this group had not evidenced an intention to award what he believed was fair treatment to debentures. Besides, the Kansas City or Fontaine Committee represented only a small amount of this latter class, and as previously stated, very unsatisfactory results had been had in attempting to provide representation for the great majority which still reposed in the hands of the depositary bank, selected by the Bogie Committee.

At the hearing in January, 1937, the court again urged the representatives of bond and debenture holders to get together upon a plan, and there was finally proposed a plan which contemplated the payment to debenture holders of $20 on the $100, in full discharge of their claims, and the turning over to bondholders, after payment of costs of administration, all remaining cash and securities of the new corporation. The court consented to permit all groups to submit this proposal to their respective interests, but clearly indicated that it was not bound by the terms, should it ultimately be convinced that the plan should be modified in either direction. In other words, it was felt that such a proposal furnished at least the basis for consideration by the security holders, and all committees were simultaneously released to solicit acceptances. The bondholders' committees, principally through the activities of the Shinners' Committee, soon obtained approval of the necessary two-thirds, but after several months the Kansas City Debenture Committee had gotten slightly less than half of the $2,000,000 of debentures to approve.

Trading had been going on in debentures, principally in St. Louis, at figures ranging higher than $25 on the $100. This had been done largely through J. W. Brady, Harold Hanser and Frank A. Dunnegan, or the brokerage firms with whom they were connected. These gentlemen became very active in opposing the acceptance of the proposal of January 21, 1937, by debenture holders, and later, with Harry G. Thompson, liquidator of the Canal Bank & Trust Company of New Orleans, which held some of the debentures, applied to the court for permission to form another debenture committee, with the avowed purpose of soliciting deposits in opposition to said plan. The court declined to grant this authority ex parte but referred it to the master and directed him to hold a hearing thereon concurrently with the one on the question of solvency. It was at this juncture that Calvin Wells, III, of Jackson, Mississippi, and the firm of Dufour, St. Paul, Levy & Miceli of New Orleans came into the case, mainly for Thompson, liquidator, and the Reconstruction Finance Corporation, and Charles F. Engle, who had appeared in other capacities from the inception, appeared as attorneys for the Brady, Hanser and Dunnegan group of St. Louis.

The court had appointed experts or engineers who examined and appraised the bridge property. This was necessary to determine the solvency of the debtor. Their reports were filed, the referee for the Vicksburg Division of the Southern District of Mississippi was named as master and full hearing was had upon that issue, at which the experts attended, testified and were cross-examined at length by attorneys representing all classes, consuming about two weeks. However, the principal labors of the trial of the issue of solvency and of whether a new debenture

committee should be formed were borne by the attorneys for the Shinners' Committee (which had been augmented by the appearance of Mr. Monroe of Monroe & Lemann of New Orleans, in the spring of 1936), by Messrs. Proctor of Kansas City and Munholland of Monroe for the Kansas City or Fontaine Committee on the one side; and by Brunini & Hirsch of Vicksburg, Mississippi, on behalf of the stockholders, and by Engle, Wells and Levy, upon behalf of the proposed new debenture committee. The engineers had indicated a valuation of from $5,500,000 to "upwards of $6,000,000" for the bridge property. The master was not in good health, and after finishing these hearings went to a health resort for recuperation. The court, not knowing this, and because of a critical condition which had been created by proceedings on behalf of the R. F. C. and Canal Bank & Trust Company in Liquidation, represented by Engle, Levy and Wells, in the absence of the Judge from the Fifth Circuit, directed that the reports and recommendations of the master be filed in time for a hearing before the Judge on June 15, 1937. The master returned and did his best to comply with this request, but was unable to do so effectively, and, at the hearing, the court amended its order so as to constitute the master a mere commissioner for taking testimony, and itself took over, both the issues of solvency and of the right to form a committee, for decision. Arguments were heard, extensive briefs filed on behalf of all sides and after study of the voluminous record made up at these hearings, a value, for purposes of insolvency, was placed upon the property of the Bridge Company of $6,500,000, and authority to form another debenture committee by the St. Louis and New Orleans applicants was denied.

Following the hearing of January 21, 1937, approval of deposit agreements and the entry of the order permitting committees to submit the proposal to pay debenture holders cash in full satisfaction of their claims, a "broad-side" attack was made upon the lien of the bond mortgage by the R. F. C., liquidator of the Canal Bank, and some of the debenture holders in the dissenting group which Brady et al. were seeking to represent. This attack was waged by the firms of Engle & Laub, Wells, and Dufour, St. Paul, Levy & Miceli, and as vigorously defended by the attorneys for the Shinners' Committee and for the bond trustees, with those of the Harrison Committee present, giving "moral support".

Much time and study was required, but on October 18, 1937, the court sustained the prior rights of the first mortgage bonds in an extended opinion handed down on that date, D. C., 22 F.Supp. 490. Orders of appeal were taken, first on behalf of the intervenors, who had made the attack, but because of the fact the court had set a substantial bond for supersedeas, all of the parties abandoned the appeal except the R. F. C., which it was thought did not have to give bond under the law. Extensions of the period for filing the transcript were made from time to time until the plan of reorganization was finally accepted by the requisite percentages of security holders and approved by the court, when the appeal was dismissed by the appellants.

Thus, a condition of stalemate had again arisen, after the plan of January 21 was submitted, due undoubtedly to the activities of Brady et al., and their attorneys, who, notwithstanding the court had not passed upon their application to form a committee and had specifically prohibited anyone from so acting until specially authorized, had prepared proofs of claims, etc., for those debenture holders whom they had controlled and had sent them in to the master, voting against the proposal of January 21, 1937. When this was discovered, an order was entered directing the master to return these claims and securities, and the owners were advised that Brady et al. had not been authorized to pursue this course, and the proofs would not be accepted in the forms which had thus been prepared by one of the attorneys representing that group. It, therefore, became necessary for the court to again convoke a hearing at Vicksburg, which it did on November 29, 1937.

Counsel for the Chicago Bondholders' Committee had presented and the court had signed an order, giving notice that it would determine at a hearing on November 29th whether any additional time would be allowed and how much longer the proposal of January 21st would be kept open, or whether it would consider dismissing the proceedings as impossible of completion under section 77B, or take such action as might be deemed proper under the circumstances. As previously stated, the parties had been permitted to submit to the creditors the proposal of January 21, 1937, for their consideration, but with the clear understanding that the court was not bound thereby and would be governed by

what it should determine to be just between the two classes, when confronted with an application to formally approve a plan.

At the meeting on November 29th, the controversy was mainly between this group from St. Louis and the liquidator of the Canal Bank, with their attorneys heretofore named, on one side, and the Bondholders, actively represented by the Shinners' Committee and its counsel, which as stated, had grown to include the firm of Monroe & Lemann, on the other. Besides, the attorneys and some of the members of the Harrison Committee were present, advising and assisting bondholders in defense of the contentions of this new group of debenture holders, as were also the Chicago and Jackson attorneys of the bond trustees. The court again advised and urged the parties to attempt an amicable adjustment of their differences, in order that some concrete plan might be submitted with reasonable expectation of acceptance, but without success. At this juncture, the court thought it necessary to exercise the extreme limit of such powers as it possessed under the law, and frankly informed those attending the hearing that, in as much as their efforts of the past had failed, and the matter had been so long delayed, it thought that a fair basis of settlement between bonds and debentures would be the payment to the latter of 20% cash, and the giving to them also ⅖ths of the stock in the new company; while the bondholders should receive the remaining cash, after payment of costs of these proceedings, a first mortgage upon the bridge property for the balance of principal and interest, without compounding, and the remaining ⅗ths of the common stock; that if the then representatives of the two classes before the court were not willing to submit and recommend the acceptance by the creditors of this proposal, it (the court) would seriously consider entering an order suspending the authority of all of them to further solicit or advise the actual owners of the securities, and would have the reorganization trustees, under the immediate supervision of the court, submit the suggested plan to the security holders direct, for the reason that, in its judgment, if no adverse influence was allowed, it was believed the proposal would be accepted by the requisite percentages of both classes necessary to carry it through. All of those representing debentures promptly agreed to recommend the idea, but those for the bondholders asked for time to discuss it with the members of their committees, etc., and within a few weeks, the court was advised that the plan would be recommended by the bondholders' committees. In view, however, of the previous failure of debenture representatives to get approval of the necessary ⅔rds, the bondholders' committees requested, and debenture representatives were required to do this before bondholders were asked to approve. The plan was shortly approved by more than the necessary percentages of both classes. In pursuing this course, the court felt, in view of the experience with revenues over the period of its administration, there was a possibility that the property might eventually work out more than enough to pay the principal and interest on the bonds, and if so, then since debentures were giving up 80% of their claims, they should be allowed to participate in this eventual equity, if it materialized, in the proportion which they had contributed the money for building the bridge.

Although authority to form another committee for debentures had been denied, with the indication of the approval of the court's suggestion by this group, they were formally authorized to submit it to their clients, and attorneys representing them joined in the final work of bringing it to conclusion. They had taken the position, in seeking to provide further representation for this class, that the Fontaine Committee had committed itself to the proposal of January 21, 1937, which contemplated the payment to these claimants of only 20% cash in full settlement, and were not free to urge better treatment which the applicants thought debentures should receive. This was in a measure true, but as previously stated, the court had advised it would only approve such terms as it thought fair after full consideration, regardless of whether the proposal was accepted by the necessary percentages or not. Its decision, in the course finally pursued, was influenced more by the facts developed on the solvency hearing, values and estimates, together with its knowledge of earnings, etc., during the time of its administration, than anything else.

After the matter had reached the stage of submitting the plan suggested by the court, it was handled, from the bondholders' standpoint, largely by the Shinners' Committee and its counsel, and for the

debentures by the Fontaine Committee and its counsel. However, all of the St. Louis group, the liquidator of the Canal Bank, and their counsel, and those of the Vicksburg-New York Committee, joined in the efforts to have it approved. It was agreed between the Shinners' Committee and the Harrison Committee that the putting into execution of the plan, depositing of old and distribution of new securities, to bondholders, except as to those deposited by the latter committee in Banks at Vicksburg and New York, should be conducted by the former. It was also thought advisable to have a single depositary and committee to discharge the same functions for debentures, and accordingly the Fontaine Committee and the First National Bank of Kansas City did the work for that class. This, of course, has entailed much labor and care on the part of these groups, particularly of counsel in putting the approved plan into execution.

At the time receivers were appointed, revenues of the bridge from all sources had dwindled to less than $24,000 a month, and the court felt that a reasonable test period should be afforded from which a fair estimate of future earnings could be made. It had been completed and opened to traffic in April, 1930, after the depression had set in, and which made figures for the first 3½ years an unsafe guide. The court stated, several times in the course of its handling of the matter, that for this reason it would not act hurriedly. This policy was thought to be justified also by a road-paving program in Mississippi, and improving business conditions. Revenues increased substantially and to the point where, in the best months of the fall of 1937, they had reached approximately $50,000. After expending some $350,000 upon the bridge structure, payment of current taxes, insurance and the allowance of compensation and expenses to the trustees and their attorneys, hearings, etc., there was on hand, when the plan was finally approved, in excess of $1,100,000 in cash, for distribution to the security holders and the payment of costs of these proceedings.

The above recital at length of the history and principal points or "high spots", so to speak, of this case, has been made to show the extent of the activities, labors and positions of the several groups in the handling of the estate. It was not a complicated matter, in the sense that an industrial plant, requiring large working capital, and employing many persons, would have been, and should have been worked out more expeditiously than was done, but for the wide differences of opinion among those appearing for creditors and others. However, the conflicting contentions of those who had promoted, sold its securities and managed its affairs from the inception and preceding its coming into court; the voluntary association of large numbers in each group, both of counsel and individuals, attempting to participate, with consequent conflict of ideas; prolonged hearings, at which much unnecessary time was taken with immaterial matters; and the unfortunate deaths of some of those to whom the court had endeavored to delegate some of the responsibilities of handling the matter, created a condition which was both expensive and disappointing. It, therefore, becomes the duty of the court to sift and analyze the huge claims for expenses and allowances which have been made by some forty firms, committees, individuals and institutions, amounting to nearly $600,000, to see which and to what extent they have contributed to or benefited this estate in the handling of its affairs and solving the troubles which had to be overcome before an acceptable reorganization could be accomplished. I may add that, in addition to this large total of claims, there remains the matter of final allowance to the reorganization trustees and their counsel.

Before taking up the several claims in detail, it is well to say that from the beginning the Chicago or Shinners' Committee asserted that its members would ask no compensation for their services but only expenses for itself and counsel and compensation for the latter. Thereafter, the Vicksburg-New York, or Harrison Bondholders' Committee, executed and distributed literature, assuring those who would deposit with it that it, too, would not seek compensation for its services, but only expenses and fees for its counsel.

Ordinarily, the court would have referred the claims for expenses and compensation to a master, but Mr. H. C. McCabe, referee in bankruptcy for the Vicksburg Division of the Southern District of Mississippi, to whom the issue of solvency and application of the St. Louis and New Orleans groups to form a second debenture committee, as well as other incidental mat-

ters, had been referred, continued in bad health and has since died. It was believed, in view of past experience, that such a reference would probably have entailed days, if not weeks, of hearing, with consequent accumulations of additional heavy expenses to the estate and to claimants, with the necessity for reports, exceptions and arguments before the court thereafter. Instead, it was decided to appoint an experienced accountant, with directions to audit all claims for expenses and to exact of everyone vouchers and receipts where available, affidavits and explanations in detail, so that he, the accountant, could compute, after investigation, as to railroad and Pullman fares, hotel rates, etc., reasonable charges for these items and recommend such reductions, if any, as might be justified, in the amounts so claimed. At the same time, it was definitely understood that the audit was intended to establish, as near as possible, the actual expenditures for expenses claimed and their reasonableness as such, but was not to be binding upon the court, either as to amounts, the necessity for their incurrence, or their benefit to the estate, and that all these questions would be passed upon by the court, who would determine what should be allowed, both as expenses and for compensation. The court in thus acting, in effect, has become its own master, and will take up the claims in the order stated at the beginning of this opinion, make tentative findings of fact, announce conclusions of law and distribute copies of this opinion to the several parties at interest. They will then be allowed to file exceptions or objections thereto and to furnish additional affidavits, either in support of their respective claims or in opposition to those of each other, within a time to be announced at the conclusion hereof, and thereafter a day certain will be set for a hearing at Vicksburg, when everyone will be heard as to any issue of fact or law that may be desired.

## CLAIMS FOR EXPENSES.

### Claim of the Chicago or Shinners' Committee.

#### (Auditor's Report, "Section A—1").

The Chicago Bondholders' Committee has included the expenses of its members, officers (other than those of R. Miles Warner, Secretary) and employees with those of its attorneys. The total thus claimed is the sum of $48,566.09, and the accountant has recommended the allowance of $43,276.17, as disclosed by his report, "Sec. A—1". This committee was composed of seven members, who reported traveling expenses for themselves of $3,989.56, the major item of which was one of $2,029.53, claimed by the chairman, John J. Shinners, as to which a reduction to $1,778.94 has been recommended; small reductions as to three other members have been made, aggregating $154, or a total of $404.59. The accountant states that these deductions were made because the amounts claimed exceeded first class travel by rail, including Pullman fare, and a reasonable allowance for living expenses, which in the Cities of Vicksburg and Monroe was considered to be $7.50 per day, and in Cities like New Orleans and Chicago, $10 per day.

Of course, one accustomed to travel in more expensive style, including the use of airplanes, may do so, but when a court is called upon to determine the reasonableness of such charges in matters of this kind, it must be governed by what is deemed fair for the average man, in view of the fact that other people's money is involved, and that the major purpose of these proceedings is to realize for the creditors as much as possible from the estate, without unnecessary or unfair expenditures by those who have volunteered to assist in accomplishing that result. If the purpose in flying was to conserve the claimant's time, then it must have been for the benefit of some other interest, and the additional expense incident thereto should be borne by that interest. It contributed nothing to this estate. Applying these rules, it would seem that the accountant has adopted a just criterion as the basis for computing these expenses. Mr. Shinners' expenses were incurred in traveling to and from Vicksburg and other places in connection with the Bridge Company's affairs, both before and after it was placed under Section 77B, while those of the other members of his committee were mainly for attending meetings in Chicago. Mr. Shinners, as the controlling influence, had seen fit, with the acquiescence of others connected with the Company, before it got into financial trouble, to keep its books and records in Chicago, and the members of his committee were selected from widely separated communities, and in numbers which were quite ample, to say the least.

The vast majority of the security holders, other than those of his committee who either held bonds or represented some of the holders, had nothing to say at the beginning as to these matters, and I repeat again that the claimants must remember that they were volunteers, without power to bind others in joining at that time in the movement, and the latter can be held only for such expenditures as the court may find reasonable, since they thereafter came into the matter with the right to expect that the court would limit expenses within those bounds. The items of the committee's expense, as it applies to the members thereof, Messrs. Shinners, Scattergood, Allworth, Congdon, Baxter, Howard and Warner, will be passed for allowance in the aggregate sum recommended by the accountant, to-wit $3,584.97, instead of the amount claimed.

### Claim for the Expenses of the Attorneys for This Committee.

■ What has been said above with respect to the committee members, of course, applies with equal force to the attorneys employed to handle the legal end of their fiduciary responsibilities. The law contemplates but one fee for attorneys to such a group, and if large numbers are employed, widely separated, and expenses are multiplied thereby, the court must answer the pertinent question of whether, in the first place, more than one firm was necessary; and secondly, whether the expenses incurred by the number functioning were likewise necessary. In doing so, it must assume the attitude of a prudent administrator, and ask what he would have done under the circumstances. Naturally, having organized his committee for operation in Chicago, Mr. Shinners sought counsel there, and in coming into either the Western District of Louisiana or the Southern District of Mississippi, he was justified in associating local attorneys in the case; but this simply meant that such reasonable fee as might be found sufficient for the services should be divided between the counsel, either according to their own arrangements, or if unable to agree, by the court.

■ The total "out of pocket" expenses claimed by the attorneys is the sum of $13,876.62, which the accountant, on the same basis used as to the members of the committee, has recommended be reduced by the sum of $837.53 to $13,039.09. Of the amount thus claimed, the firm of Sidley, McPherson, Austin & Burgess asks $5,952.16, Hudson, Potts, Bernstein & Snellings $5,655.13 and Monroe & Lemann (who came into the case in the spring of 1936) $1,539.89. These firms were represented in practically all instances by Messrs. Oates, Hudson and Monroe, respectively. The wide separation of their residences,—Chicago, Monroe and New Orleans,—brought about the use quite extensively of the long-distance telephone, telegraph and traveling for conferences, during the first two years between Mr. Oates and Mr. Hudson, and the last two between all three. Mr. Hudson, of course, in so far as the location of the company's property and the place where formal hearings were had in Vicksburg and Monroe, was much nearer than the other two, and his expenses for traveling should have been proportionately less. However, there appear in the itemized list of these expenditures several amounts which cover hotel expenses of the three, paid by Mr. Hudson, which to some extent accounts for an increase in his claim, and correspondingly less in those of the other two. Mr. Hudson has also included expenses of his secretary in most instances of his trips to other places, where, no doubt, he could have had the facilities of his associates or the services of a public stenographer at much less cost. In private business, one is entitled to use his own judgment in such matters, but in a trust estate where, as here, the creditors to whom the money belongs are compelled to forego a considerable portion of their investment, it is the duty of the court and all concerned to apply the rules of reasonable economy. It also appears that on the bill of Mr. Hudson, as well as the other attorneys and committee personnel, are included large sums for telephone and telegraph messages, aggregating $6,117.18. Being familiar with the nature of this proceeding as it progressed, the court is of the view that most of these matters could have been handled by mail at a considerable saving to the estate, and in only rare instances was it necessary to use the telephone in such sizable figures. There are also included charges for services of private stenographers in making copies of documents for the use of the claimants and their various associates. The auditor has eliminated them in his recommendations. He has also, for the benefit of the

court, culled the expenses of Mr. Hudson's secretary from the various items for traveling and the amount thus found is $432.85, which will be disallowed. I am also of the view that not more than one-third of the expenditures for telephone and telegraph was reasonably necessary. The amount for these items will, therefore, be reduced to $2,039.06.

The accountant has, as to Mr. Oates, applied the same rule to travel and living expenses as he did to everyone, and the figure which he recommends for this firm of $5,393.71 will be passed accordingly, as well as $1,476.92 for Monroe & Lemann. A goodly portion of the expenses of the attorneys is attributable to the fact that there were three firms and they thought it necessary to do a considerable amount of traveling for conferences and to use long-distance telephone and telegraph to an extent which I believe could have been greatly minimized. Much of these expenses was incurred prior to the court's approval of the deposit agreements of the three committees seeking to represent the security holders, two for bondholders and one for debentures. It was also at a time when the Chicago Committee actually represented less than one-fifth of the bonds outstanding, due, to some extent, to the fact that the court had not permitted it to solicit further deposits.

■ This committee has also claimed the sum of $21,262.63 for printing and stationery, $14,207.95 of which preceded the approval of the plan finally adopted, and the balance of $7,054.68 is covered by a supplemental claim and was occasioned in the execution of the approved plan. The accountant has recommended a reduction of $2,731.05 as overtime in the claim for printing, thereby reducing it to $18,531.58. The sum of $566 of this overtime was paid to the Twentieth Century Press (which did most of the printing for this committee) on bills dated in August and December, 1934, and covered the printing of the original plan of reorganization, etc., which was tendered by the debtor, and which the court would never allow to be submitted. It was before the order was entered in January, 1935, prohibiting the soliciting of deposits by any persons or committees, and was done, no doubt, in an effort to gain control of as many bonds as possible in competition with the other committee. There does not appear to have been any emergency, certainly none beneficial to the estate, requiring the rushing of this work and the committee must have taken the responsibility therefor upon itself. The accountant's recommendation for its disallowance will be adopted to that extent. The next item is under date of February 24, 1937, and was in the sum of $3,466.39, for printing 7,500 copies of the plan of reorganization (the submission of which was permitted by an order in January of that year), which contemplated the payment of 20% cash in full settlement to debentures. Of the amount so expended, $1,164.18 was for overtime, or approximately one-third. Here again, although the committee and its counsel were desirous of having the proposal submitted as promptly as possible, I do not think the situation justified this rather reckless expenditure of the creditors' money, and the recommended disallowance will be adopted. The remainder of the overtime was in connection with the submission of the plan, as amended, which the court indicated it would approve. These items were incurred in December, 1937, and February and April, 1938. The total claim was $5,140.61, of which $1,000.87 was for overtime. At this stage of the matter, it had reached the point where there was every reason to believe the plan would be accepted, since all committees and representatives of security holders had agreed and undertaken to recommend its approval, and, in my opinion, the estate was benefitted by the course pursued. The Chicago Committee agreed to and did arrange for the printing of enough copies of the plan, order, etc., for the use of all the others, and duplication of work was thereby avoided. Therefore, these items, aggregating $5,140.61, appearing on "Schedule B" attached to the report of the accountant on the claims for expenses of the Chicago Committee, under dates of December 27, 1937, $383.10, February 12, 1938, $2,982.88, April 1, 1938, $959, and April 1, 1938, $815.63 will be passed for approval.

■ Included in the printing bill are two items for printing two separate briefs by Hauser Printing Company of New Orleans, one of 69 pages, costing $171.60, and the other of 273 pages, $1,095, of which 100 copies were printed in each instance. This was an unwarranted ex-

pense as there was no necessity for printing these briefs for the use of the district court. In most instances, counsel typed their briefs, which served every purpose. There certainly was no necessity for one hundred copies of each. I am inclined to believe that much of the large and unusual expenses of this committee would not have been incurred but for the fact that Byllesby & Company were advancing funds, for if the parties had been put to the necessity of taking the money out of their own pockets, or looking to the court before they were paid, I feel sure a great deal of it would have been avoided. This printing bill will be reduced to the sum of $200 and the difference of $1,066.60 will be disallowed.

■ The items embraced in the supplemental petition for the sum of $7,054.68 were for the printing of the bonds and other securities, the trust indenture under the approved plan, etc., and will be allowed, as recommended by the accountant. This committee also claimed the sum of $2,742.35, for postage over the entire period, which the auditor indicates is proper and the same will be passed for allowance.

It has also claimed for its members (as distinguished from the attorneys) the sum of $967.68, for long-distance telephone calls, but this has been considered in the gross bill for telephone and telegraph above, and will be eliminated.

■ Claim is also made for a total of $2,600.50, for extra copies, three in some instances and two in others, of testimony taken before the masters appointed in this case, mainly because each of the three firms of attorneys wished a copy. This was an unnecessary multiplication of expenses and the accountant's recommendation that it be reduced to the price of one copy of each hearing, or the sum of $1,295.75, will be adopted. The court had itself required the reporters to file three or more copies with the record in each instance.

■ This Committee has also claimed the sum of $1,000 paid to Coverdale & Colpitts, for services in connection with the valuation of the bridge on the issue of solvency. The court had already appointed engineers for the purpose of valuing the property, who had made examinations and reports at great expense to the estate, and this committee was not authorized to incur the additional expense of employing experts of its own. If it could do so, without first obtaining authority from the court, then the persons representing other claimants could have done likewise, with the consequent large increase of expenses to the estate. Of course any necessary witness could be summoned, if he resided within the required distance, to the hearing, otherwise his testimony could be taken by commission, but none of them had the authority to employ experts at the expense of the estate, without first showing the necessity therefor and obtaining an order from the court. This item will, therefore, be disallowed.

■ The sum of $473.58 was paid to the Corporate Trust Company of Connecticut, in connection with the organization, etc., of the new company, including an attorney's fee of $50 to Henry Jamerson. This expenditure appears to have been proper and reasonable and the same will be passed for allowance.

### Flowers, Brown & Hester.

The law firm of Flowers, Brown & Hester of Jackson, Mississippi, in the beginning of these proceedings, in February, 1934, were employed by the same group of bondholders who had first employed the firms of Mr. Oates and Mr. Hudson in resisting the receivership proceedings in Mississippi and in Louisiana. About the same time, Mr. W. H. Watkins, of Jackson, Mississippi, had been employed to represent the old corporation, and when the issue of receivership, bankruptcy, etc., were settled, and Mr. Watkins became one of the attorneys for the receivers, later for the trustees, the firm of Flowers, Brown & Hester became attorneys for the corporation. They have claimed expenses in the sum of $606.72, incurred in attending hearings in Vicksburg and Monroe, or otherwise in connection with this employment. The auditor has carefully checked the claim, applying the same rules as to all others, and the amount recommended will be passed, as will also the item of $78.43, incurred by Mr. Watkins before he became attorney for the receivers.

Similar items of $28.14 of Winston, Strawn & Shaw, and $15.15 of Henry Jamerson, have been checked and, as recommended by the auditor, will be passed.

To recapitulate: The items of expense of the Chicago Bondholders' Committee, which are tentatively passed, are as follows:

| | | |
|---|---:|---:|
| Committee Members: | | $ 3,584.97 |
| Attorneys: | | |
| Hudson, Potts, Bernstein & Snellings | $5,006.17 | |
| Sidley, McPherson, Austin & Burgess | 5,393.71 | |
| Monroe & Lemann | 1,476.92 | |
| Flowers, Brown & Hester | 606.72 | |
| Watkins & Eager | 78.43 | |
| Winston, Strawn & Shaw | 28.14 | |
| Henry Jamerson | 16.15 | |
| | | 12,606.24 |
| Printing and Stationery | | 18,465.85 |
| Postage | | 2,742.35 |
| Legal Service Organization new Co. | | 473.58 |
| Henry Jamerson, Fee | | 50.00 |
| Court Reporting | | 1,295.75 |
| Sundry | | 1,591.17 |
| | | $40,809.91 |
| Less excess tel. and tel. bills (disallowed) | | 4,078.12 |
| Total Net | | $36,731.79 |

R. Miles Warner, Secretary.

(Auditor's Report, Sec. A–2).

In addition to the amount claimed by members of the Chicago committee and its attorneys, Mr. R. Miles Warner, a member of the committee (whose expenses as such in the sum of $131.57 have been passed for allowance above), acted as secretary and has filed an additional claim for expenses in the sum of $6,312.50, which the auditor has recommended for allowance. This is made up entirely of a charge at the rate of $125 a month, for fifty and one-half months, in handling the clerical work of the committee, including its correspondence, mailing of literature, etc., performed by the regular employees of Byllesby & Company. For two years of this time (January, 1935 to January, 1937) by express order of the court, this committee and all others were prohibited from soliciting deposits or carrying on communications with the security holders and I do not believe there was such volume of work as to justify a full-time employee at this price. No doubt letters were written occasionally, to answer inquiries of restless security holders, but not enough to warrant the allowance of the amount claimed for the full time, and the claim will, therefore, be passed for the sum only of $3,312.50. These employees apparently lost nothing from their regular work.

Lambert & Hart.

(Auditor's Report, Sec. A–3).

Lambert & Hart, attorneys of Washington, D. C., have claimed expenses consisting of telephone, telegraph and taxi fares, in rendering services to the Chicago Committee, in Washington, amounting to $33.85, which the auditor has recommended for payment. This item appears to have been justified and will be passed.

City National Bank of Chicago.

(Auditor's Report, Sec. A–4).

The Chicago Bondholders' Committee employed the City National Bank of Chicago as its depositary on February 24, 1937, following the court's action approving deposit agreements and releasing all committees for the submission of the plan of January, 1937, which contemplated the payment to debentures of 20% cash in full settlement. This bank has made claim in the sum of $8,638.58, of which amount the auditor has recommended the allowance of only $3,946.85. He has calculated the amount due on the basis of fifty cents apiece for accepting securities for deposit, and yearly maintenance of the account, fifty cents apiece for cancellation of certificates of deposit and returning securities to depositors, fifty cents per account for distributing cash, new bonds and voting trust certificates to depositors, one cent per share for distributing common stock to depositors, when separately claimed, and three cents per name for furnishing lists of depositors. He has recommended the disallowance of attorney's fees in connection with these services, and also the claim of the representative of the depositary who attended as a witness in Vicksburg on March 30, 1938, and May 3, 1938, for compensation in the sum of $150, as well as a reduction of his traveling and living expenses to the basis recommended for all claimants.

For a clearer understanding of this claim, the items and the allowances recommended by the auditor are given as follows:

| Depositary Charges: | Claimed | Recommended |
|---|---|---|
| Accepting 3,554 bonds | $3,469.50 | $1,777.00 |
| Issuing 1,304 Certificates of Deposit | 652.00 | 652.00 |
| Cancelling three certificates | 7.50 | 1.50 |
| Canceling 170 certificates | 85.00 | 85.00 |
| Examination of legal papers | 96.00 | NONE |
| Furnishing list of 963 Depositors | 48.15 | 28.89 |
| Furnishing certificate covering bonds on deposit with supplemental list of depositors | 20.00 | 20.00 |
| Accepting 174 Bonds | 169.50 | 87.00 |
| Issuing 223 Certificates of Deposit | 111.50 | 111.50 |
| Examination of legal papers | 4.00 | NONE |
| Cancelling 41 certificates | 20.50 | 20.50 |
| Custody for 1½ months | 90.80 | 90.80 |
| Telegram | .56 | .56 |
| Postage and Insurance | 138.44 | 138.44 |
| Accepting 4 bonds | 3.50 | 2.00 |
| Issuing 122 Certificates of Deposit | 61.00 | 61.00 |
| Canceling 68 Certificates | 34.00 | 34.00 |
| Preparing List of Depositors as of 4/19/38 and calculating distributive shares in the new securities | 25.00 | 25.00 |
| Additional Charges in Distribution: | | |
| Distribution of new bonds, stock and issuance of 1,362 checks | $3,298.69 | $ 681.00 |
| Fee for Services and Expenses of Officer at Court Hearings: | | |
| Fee for Services of W. T. Anderson | $ 150.00 | NONE |
| Expenses of W. T. Anderson at Court Hearing on 3/30/38 | 81.65 | 69.08 |
| Expense of W. T. Anderson at Court Hearing on 5/3/38 | 71.29 | 61.58 |
| Total | $8,638.58 | $3,946.85 |

The recommendation of the auditor, preceding the heading "Additional Charges in Distribution", will be adopted and passed for allowance. See In re Paramount-Publix Corp., D.C., 12 F.Supp. 823. The amounts so recommended appear ample, the depositary, presumably, has its own legal staff for advice in such matters, and there is no justification for extra charges of that kind.

However, I cannot agree with the auditor in his recommendation as to the distribution of new bonds, stock and checks. Inasmuch as each bondholder was to receive a check and there were 1362 checks issued, there must have been an equal number of owners of bonds, stock and voting trust certificates. The opening and maintaining of the 1362 accounts had been covered in the charges preceding the heading above of "Additional Charges and Distribution". In distributing the new securities, the depositary needed only to enter upon the same accounts the items covering these services. The court had required that the new bonds and stock should be attached together (10 shares to each $1,000, and 5 shares to each $500 bond), and made them not subject to transfer of one without the other, until the bonds have been paid, the purpose being to prevent outsiders from getting control of the new company by the purchase of stock, which in the beginning would have little value, and to insure that it should remain in the bondholders. This made it necessary to have as many stock certificates as there were bonds but they were part of one instrument. In the first claim filed, under date of April 12, 1938 (in which the bank charged on the basis of $1 apiece for $1,000 bonds and 75 cents each for $500 bonds), there were 3,216 of the larger and 338 of the smaller bonds, of a gross face value of $3,385,000. The supplemental claim, dated May 5, 1938, increased the face amount of the new bonds to $4,437,500, but instead of using the same basis for its charges, the claimant charged a percentage (1/16 of 1%) of the face amount of the bonds and 1 cent per share for the stock of 35,500 shares. Under the circumstances, I think a charge of fifty cents apiece, or $1,775, would be ample. I also think that the charge of 12½ cents apiece for issuing checks is excessive, and that 5 cents each for the 1362, or $68.10, sufficient. The recommendations of the auditor as to the remainder of the items under the heading "Fee for Services and Expenses of Officer at Court Hearings" appear to be correct and will be passed. This reduces the whole claim of $8,638.58 to $5,108.95, which has been passed.

Summarizing the claims of the Chicago Bondholders' Committee and associated persons and institutions for expenses, the total sought was $63,539.02 (members of the committee and their attorneys, $48,554.09, Secretary of the Committee, $6,312.50, Lambert & Hart, $33.85, and the depositary, $8,638.58) and the amount passed has been reduced to $45,187.09. I am conscious of the fact that much of the amount disallowed has been actually expended, but it is my duty to approve only what I think was reasonably justified and it has been necessary to reduce the amounts claimed accordingly.

Claim of the Bogie Committee.
(Auditor's Report, Sec. E–1).

This is the debenture committee mentioned earlier in this opinion as having been formed at the instance of the officers

of the old company, for the purpose of preventing a receivership when default was first made in the interest of this class of securities. It was not only of no benefit in bringing about an adjustment of the debtor's affairs, but actually caused a considerable part of the delay and much expense, due to the unwillingness of its members and attorney to heed the court's warning in the beginning that it could not, under the circumstances, represent these security holders. Besides, during the period from its creation in the fall of 1932, until the matter came into the hands of the court, Mr. Bogie collected several thousand dollars out of funds of the estate as salary and expenses, which he turned over to his employer, Byllesby & Company. For the reasons stated, no allowance will be made on this claim.

### New York-Vicksburg Bondholders' Committee.

#### (Auditor's Report, Sec. B–1).

This committee in its first application made a claim for expenses totaling $25,163.17, of which the auditor has recommended allowance of $18,618.21; and in a supplemental application, it has added the sum of $355.66, of which $59.55 has been recommended for allowance.

It was organized about the time the receivers were appointed, in February, 1934, and consisted of six members, some of whom resided in the City of Vicksburg, and others in the City of New York. It employed three law firms, two in Jackson, Mississippi, and a third in New York, which also associated other individual lawyers with it. The committee registered with the Federal Trade Commission under the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., and set about soliciting the deposits of first mortgage bonds. Many of its members and its lawyers appeared at hearings before the masters and before the court. As previously stated, it opposed the application of the debtor to come under Section 77B and its plan; but at the same time itself proposed similar relief and a plan of its own. Its work and that of its attorneys, depositaries and agencies were, in large measure, a duplication of similar efforts on the part of the Chicago Bondholders' Committee, although until the court authorized the submission of the plan of January, 1937, the relations and attitude of the two committees were more or less hostile and non-co-operative. This committee only succeeded in obtaining deposits of $288,000 of bonds, which were gotten in hand shortly after its organization.

In the first application, traveling expenses were claimed in the sum of $7,612, which the auditor, applying the rule previously mentioned, reduced to $6,813.79. The major items, amounting to approximately $5,000, were incurred by two members of the committee residing in New York and New York attorneys, and what has been said as to the Chicago Committee applies equally here. However, they have rendered some service to the estate and the amounts recommended by the auditor will be passed, as they apply to traveling expenses.

The committee has also claimed $2,563.09, as telephone and telegraph expenses. This is more than one-third as much as claimed by the Chicago Committee. As stated, the present applicant represented and handled only a small amount of the securities, and I am sure that at least two-thirds of this item was not reasonably necessary. It will, therefore, be reduced to $854.36.

The auditor has recommended a reduction in an item of $1,426.05 claimed for stenographic and clerical services to the sum of $560.05. This was because $506 of the amount was for overtime and $360 for work done by the regular force of Coudert Brothers. There does not appear to have been any emergency requiring expenditures for overtime, and counsel are not entitled to compensation for the services of their own clerical help. The recommendations of the auditor will be adopted and the claim passed accordingly.

It has also been recommended that an item of $6,366.05 claimed for stationery and printing be reduced to $5,277.69, as including unnecessary overtime, and the recommendation will be adopted and the latter amount will be passed, together with an item of $765.34, for postage.

This committee has claimed the sum of $3,750.24, as interest upon funds borrowed by it, using the bonds of its depositors as security. I know of nothing to support this charge and it will be disallowed, as recommended.

An item of $703.30 has been claimed to cover copies of notes of evidence furnished

for some of the hearings, and as it appears to be just about in proportion to the amounts passed for the other bondholders' committee, for the same purpose, it will be tentatively passed, as recommended.

The sum of $528.20 has been claimed as paid to A. W. Porter, Inc., as commissions and expenses in soliciting the deposit of bonds. Only three bonds were obtained for deposit and the auditor has recommended an allowance of $486.05, reducing traveling expenses to the basis applied to others. Since this committee, along with the Chicago Bondholders' Committee, had agreed and promised to charge nothing for the services of its members, this item will be passed.

Legal advertising in the sum of $820.85 has been claimed and recommended. The item appears to be reasonable under the course which this committee pursued and will be passed.

The amount of $628.05, under the heading of "Sundry", has been recommended for allowance. It embraces an item of $166.67, paid the Federal Trade Commission as a filing fee, $250 for an audit of the committee's accounts, and $211.38 for miscellaneous expenses and will be tentatively passed.

The net amount thus passed, after deducting two-thirds of the telephone and telegraph bill, as well as other items not recommended by the auditor, leaves a remainder of $16,969.03.

### Claim of Joseph M. Mulford.

(Auditor's Report, Sec. B–2).

Joseph M. Mulford has also claimed the sum of $243.26 as secretary in New York of this committee. This money was spent for postage on letters to bondholders, etc., but the claim has been recommended for allowance only in the sum of $178.53, because the difference has been included in the general claim of the committee, and the amount recommended will be passed.

### Claim of Coudert Brothers.

(Auditor's Report, Sec. B–3).

Coudert Brothers, one of the firms of attorneys representing this committee, have made a separate claim of $180.61, for traveling expenses, telephone and telegraph, postage, stenographic and clerical help. The auditor has recommended for allowance all items except the $17.50 for clerical help, and the recommendation will be passed.

### Claim of Lloyd S. Carter.

(Auditor's Report, Sec. B–4).

The separate claim of Lloyd S. Carter, for $174, as expenses, has been recommended for disallowance, because it is a duplication of the same item in the general claim of the committee and the recommendation will be passed.

### Claim of Fred Esch.

(Auditor's Report, Sec. B–5).

Mr. Fred Esch, an attorney of Washington, D. C., filed a claim for the sum of $187.97, covering traveling expenses ($131.17), telephone and telegraph ($48.86) and sundry ($7.94), in connection with his services to the committee, in filing registration papers with the Trade Commission, which has been recommended, appears to have been reasonable and necessary and will be passed.

### Claim of Alvin T. Sapinsley.

(Auditor's Report, Section B–6).

Alvin T. Sapinsley was one of the attorneys associated with Coudert Brothers whose traveling expenses, etc., they failed to include in their general claim. The amount he seeks is for telephone and telegraph, stenographic services and postage, aggregating $79.07. The auditor has recommended a disallowance of $15, charged for stenographic services for the same reasons for which those of other attorneys have been denied,—that is, they are presumed to furnish their own help in the ordinary operation of their offices. The amount recommended for allowance is $64.07, and will be passed.

### Claim of A. W. Porter, Inc.

(Auditor's Report, Sec. B–7).

A. W. Porter, Inc., have filed claim for cash expended in soliciting bonds under an agreement with the New York-Vicksburg Committee, in the sum of $385, which the auditor has recommended be disallowed. The understanding with the committee was that this claimant was to receive $5 for each bond which it succeeded in having deposited, and, as stated, only three were deposited. Shortly after its work started,

the court prohibited all persons, under an order of January, 1935, from soliciting deposits, which continued in force for about two years; hence this claimant could do nothing further. However, the agreement was terminable at the will of the parties, the committee had no authority from the court to incur expenses of this kind and the claim will be disallowed. Earlier in this opinion, the court has considered an item for expenses of this claimant connected with the same matter, which was included in the claim of New York-Vicksburg Committee, part of which was passed, and there appears no sufficient reason for granting further relief.

### Claim of Marine Midland Trust Company.

(Auditor's Report, Sec. B-8).

The Marine Midland Trust Company of New York has claimed expenses in the sum of $683.50, as one of the depositaries of the New York-Vicksburg Committee, in connection with the receiving of ninety bonds ($90,000), issuing thirty-seven certificates of deposit, maintaining twenty-two accounts for four years, charges upon the deposit, bonds, postage, etc., transfer and attorneys' fees. The auditor has recommended disallowance of the attorneys' and administration fees, reduction of the charge for maintenance of the accounts, from $2 to $1 each, as well as the reduction from $5 to 66¢ each, for the issuing of four lists of depositors, leaving a balance of $295.51.

While the amount of bonds and number of depositors was small, when compared to the total outstanding, the services performed were beneficial to the owners and the ultimate winding up of the estate. It is true that this committee selected two depositaries, one each in New York and Vicksburg, thereby increasing the expenses, but this was possibly done for the convenience of the depositors. The bill as rendered includes two items of attorneys' fees, of $200 and $100 each, which the auditor has correctly excluded as well as the administration fee. The claim will be passed for the sum of $295.51, as recommended.

### Merchants' National Bank & Trust Company.

(Auditor's Report, Sec. B-9).

The Merchants' National Bank & Trust Company of Vicksburg, Mississippi, has also filed claim for expenses in the sum of $297, as sub-depositary for the New York-Vicksburg Committee, covering services upon $198,000 of bonds, or more than twice the number deposited with the New York depositary. The charge is at the rate of $1.50 per bond over the entire period. The auditor has recommended reduction to $247.50, or on the basis of $1 for the first year and 25¢ for the three succeeding years. In view of the fact that this bank, so far, has not multiplied charges, I think the amount claimed is reasonable and will be passed.

### The Kansas City or Fontaine Debentureholders' Committee.

(Auditor's Report, Sec. C-1).

This committee has made claim for expenses and the auditor has recommended allowances as follows:

| Traveling Expenses | Claimed | Recommended |
|---|---|---|
| David M. Proctor | $1,594.31 | $1,474.36 |
| C. L. Fontaine, Jr. | 1,360.79 | 1,319.40 |
| H. C. Clowdsley | 50.50 | 50.50 |
| C. K. Davis | 133.90 | 132.60 |
| A. J. Scott | 128.71 | 131.03 |
| C. T. Munholland | 443.05 | 253.39 |
| Geo. M. Buecking | 215.91 | 197.93 |
| Geo. M. Blackmar | 438.25 | 387.75 |
| | $4,365.42 | $3,946.96 |
| Telephone and Telegraph | 225.43 | 225.43 |
| Stenographic and Clerical | 1,679.59 | 1,679.58 |
| Printing | 1,645.95 | 1,262.85 |
| Postage | 465.36 | 465.36 |
| Attorneys' Fees | 350.00 | NONE |
| Sundry | 369.95 | 169.95 |
| Total claimed | $9,101.69 | |
| Total recommended for payment | | $7,750.13 |

The same rule as to travel and subsistence has been applied, but the auditor has called attention to the fact that Mr. Munholland has made a charge only of five cents per mile for the use of his automobile, amounting to $443.05, and nothing for subsistence. He reduced the traveling expenses under the rule generally applied, to the sum of $253.39. The court is familiar with the circumstances of Mr. Munholland's action in the matter and is of the opinion that this difference is more than compensated for by the failure to claim anything for subsistence and the full amount will be passed, as will also the item for postage claimed by the committee, which seems reasonable.

The auditor has correctly eliminated the item for attorney's fees to Mr. Proctor, as his entire services to the committee will

be considered in connection with the application for attorney's fees.

The claim for "Sundries" of $369.95 includes auditing, stationery, interest on note, etc., of which the auditor has recommended the disallowance of $200 covering "pre-organization expenses", reducing it to $169.95, for the reason that the difference is included in the traveling expenses claimed by Messrs. Proctor and Fontaine. This appears to be a duplication and the recommendation will be followed. The item for interest on note of $98.06, will be disallowed, as in the case of a similar claim by the New York-Vicksburg Committee, thus reducing the amount approved for "Sundries" to $71.89.

The item of $225.43 for telegraph and telephone expenses recommended for allowance is not excessive for this committee, and the same will be passed.

■ This committee has also claimed the sum of $1,679.58, for stenographic and clerical help over the entire period of more than four years, consisting of payments to a number of individuals, ranging from $3 to $575, and serving the secretary and members of the committee from time to time. One item of $239.41, listed as due Mrs. Lillyan Foltz, is to go to Mr. Proctor, one of the attorneys for the committee, but it appears from his affidavit that his firm was, compelled to employ an additional stenographer during the time of this extra work for the committee. The amount claimed has been recommended for allowance, does not appear unreasonable and will be passed.

An item of $1,645.95, for printing, is claimed and the auditor recommends a reduction of $383.10, as having been paid by the Chicago Committee, for which it has also made claim. This recommendation will be adopted, leaving a balance of $1,-262.85 on the claim for printing, which is not excessive, and it will be passed.

The net result of the dispositions thus made of the expenses claimed by this committee is that $189.66 has been added and $98.06 taken from the total recommended by the auditor, and making a final figure of $7,841.73, which is passed.

### Claim of the First National Bank of Kansas City, Mo.

#### (Auditor's Report, Sec. C–2).

■ This bank has been the depositary of the Kansas City Debentureholders' Committee since its organization and has made claim for the sum of $4,666.86, of which the auditor has recommended the allowance of $2,517.60. He suggests the elimination of two items of $100 each claimed as acceptance fees, and the reduction of the fee of $1 per thousand for the acceptance of 1485 debentures, to fifty cents each, reducing this item to $742.50, with a further reduction from 75 cents to 25 cents, as to 162 $500 debentures, handled in the same way, or $81; also that a charge of 7 cents per name for three lists of 539 depositors, amounting to $37.73, and for two similar lists of 557 depositors in the sum of $33.42, be reduced to $16.08 and $17.71, respectively. I am of the view that the auditor has correctly adjusted these charges, with the exception of the lists of depositors, which charges seem to have been, on the basis of three copies, less than three cents per name, the figure adopted by the auditor. There were five lists altogether, the first three of the same number and the last two containing 18 more names; and the figures claimed will be restored. Under the heading of "Additional Services", there appears $783 for distributing 15,660 shares of new common stock, or at the rate of five cents per share, and the auditor recommends a reduction to one cent per share. The situation in this instance is somewhat different to that of the distribution of the stock and bonds to bondholders. There, the shares of stock and bonds were unseparated instruments; whereas, here, the only securities distributed to debentures were the stock and voting trust certificates and I think an allowance of three cents per share would be right; otherwise, the recommendations of the auditor will be adopted and the claim passed for a total of $2,869.16.

### Claim of Brady, Hanser and Thompson. For Expenses.

#### (Auditor's Report, Sec. D–1).

■ These individuals have claimed a total for expenses of $2,266.22, and the auditor has recommended the allowance of $2,036.16. As stated earlier herein, Messrs. Brady and Hanser (as well as F. A. Dunnegan, who has made a separate claim) were associated with stock and bond brokerage firms in the City of St. Louis, which had been trading in the securities of the debtor, principally debentures, prior to the order permitting the Chicago Committee,

New York-Vicksburg Committee and the Kansas City Debenture Committee, to submit the proposal of January, 1937, to pay twenty cents cash to debentures, and when it became known that the rate offered was less than the prices at which this trading had been done by these claimants, they were necessarily at a disadvantage with their customers. They promptly began agitating against acceptance by debenture holders, and shortly applied to the court, along with Harry G. Thompson, liquidator of the Canal Bank & Trust Company, of New Orleans, for authority to form a second debenture committee. The major portions of the expenses claimed were incurred in connection with this application, which, upon consideration of the evidence taken before the master, the court denied, for reasons given in its written opinion; and, in attending the solvency hearing before the master which had preceded by a few days the one upon their application. One or more of them held a few debentures, and, as such, were entitled to appear and participate in the solvency hearing the same as any other security holder, since all were concerned in the value which might be placed upon the estate of the debtor. However, the law does not contemplate that, if any or all of such persons decide to attend and participate, their expenses shall be paid and compensation awarded. It is only those who have, under authority of the court, appeared and rendered substantial service to the estate, who are entitled to such consideration, for reasons which scarcely need to be recited. It is claimed, of course, that the activities of these persons and their counsel brought about the amendment to the proposal of January, 1937, finally adopted, which gave debentures ⅔ths of the common stock, and that the course which these applicants pursued in preventing the acceptance, of approximately half a million dollars of debentures, of the earlier proposal, made it necessary. Of course no one knows what the result would have been but for their activities, but the final solution was evolved and proposed by the court itself, based mainly upon what it knew of earnings over the period of its administration and the value which it had placed upon the bridge. Under these circumstances, I think it my duty to restrict the allowances of expenses to this group to those incurred at the November, 1937, hearing and subsequent thereto. At that time, they joined in and aided materially in bringing the matter to fruition.

After checking the claims of these applicants, I find that amounts should be passed in their favor as follows:

Harold B. Hanser:
1937

| | | | |
|---|---|---|---|
| Nov. 29, | Travel and subsistence | | $ 48.30 |
| Dec. 7, | " " " | | 67.80 |
| Dec. 21, | " " " | | 40.00 |
| 1938 | | | |
| May 27 | " " " | | 53.75 |
| May 3 | " " " | | 45.75 |
| Telephone and Telegraph | | | |
| From Dec. 2, 1937 forward | | | 24.95 |
| | | | $280.55 |

J. W. Brady:
1937

| | | | |
|---|---|---|---|
| Nov. 27-30 | Travel and subsistence | | $ 50.80 |
| 1938 | | | |
| March 27 | " " " | | 51.60 |
| May 3 | " " " | | 45.75 |
| Telephone and Telegraph | | | |
| From 1/25/38 forward | | | 5.80 |
| | | | $153.95 |

H. G. Thompson:
(Expense of Attorney Levy)
From Dec. 3, 1937 forward) $240.02

Travel and subsistence $240.02

$674.52

### Claim of Engle, Wells & Levy.
(Auditor's Report, Sec. D–2).

Messrs. Charles F. Engle, W. Calvin Wells III, and Leonard B. Levy have filed a joint claim for expenses as attorneys for Brady, Hanser and Thompson, aggregating $2,259.58, of which the auditor has recommended allowance of $1,025.15. Taking those of the individuals up in the order named, and for the reasons stated with respect to their clients, allowances will be made as follows:

Charles F. Engle:
From Nov. 27, 1937 forward $223.45
Travel and subsistence

W. Calvin Wells, III:
From Nov. 28, 1937 forward $142.59
Travel and subsistence

No allowance will be made for Mr. Leonard B. Levy for the reason, as disclosed by the report of the auditor, the same items have been included in the claim of the client, Thompson, Liquidator.

### Claim of Harry P. Schaub.
(Auditor's Report, Sec. E–2).

Harry P. Schaub has made claim for the sum of $690.89 for expenses, and the auditor has recommended a reduction to $431.24, applying the rules used as to other claims.

Mr. Schaub, as an individual, engaged in the brokerage business in Newark, N. J., interested himself in the affairs of this estate sometime after the proceedings had been started, made trips to Monroe and Vicksburg in connection with the ideas which he had about how it should be handled. He attended the meeting in January, 1937, at which the first proposal was allowed to be submitted and when the court concluded to release the committees which were then before it, Schaub appealed to be allowed to solicit deposits of bonds under powers of attorney in his favor. This authority was granted. He accomplished little in this direction, and instead of pursuing efforts to that end, indulged in correspondence and interviews with the representatives of debenture holders, criticizing the proposal, and urging views of his own entirely different thereto and in which he proposed to pay no cash to debentures. I am convinced that he contributed nothing to the final settlement of this matter. He claims to have suggested certain changes in the proposal of January, 1937, before it was finally approved, providing for the payment of a higher fixed interest rate on bonds, but I am of the opinion the terms of the proposal were worked out with little effect by the suggestions of Mr. Schaub. Here, again it is well to repeat, that the law does not contemplate payment of the expenses of everyone who appears in such proceedings, but there must be shown some benefit to the estate. Mr. Schaub's claim will be disallowed.

### Claim of Frank E. Dunnagan.
### (Auditor's Report, Sec. E–3).

Mr. Dunnagan is in very much the same situation as Mr. Schaub, except that he interested himself in behalf of debenture holders. He was likewise connected with a brokerage firm in St. Louis, and joined Brady and Hanser in opposing the proposal of January, 1937. There is nothing to show that he either benefited or contributed to the final settlement of the estate, and his claim will be disallowed.

### Claim of Continental Illinois Bank & Trust Co.
### (Auditor's Report, Sec. E–4).

This bank was one of the original trustees under the bond mortgage of the old company, the other being Mr. Thomas W. McCoy of Vicksburg. This claim is entirely for the expenses of its counsel residing both in Chicago and in Jackson, Miss. The amount sought is $2,472.73, of which the auditor has recommended allowance of $1,484.86. Applying the same rules as in other instances, he has reduced the item of traveling expenses from $1,549.89 to $1,207.47, and an item for "Sundry" of $727.26 has been reduced to $77.81, the latter for the reason "no itemization or explanation has been offered" and the claimant lumped sums advanced to its Chicago attorneys, with "court costs, postage, express, notary fees, and other miscellaneous items". The auditor asked for this detailed information on June 17, 1938, but it had not been furnished when the report was filed on August 26, 1938. The items recommended otherwise seem to be reasonable and will be passed. The service of this bank was that usually rendered in similar circumstances, and of course was for the benefit of the bondholders.

### Claim of H. C. McCabe, Special Master.
### (Auditor's Report, Sec. E–6.)

This is a claim for a balance of expenses of the special master, Mr. McCabe, for the sum of $37.73, which will be passed, as recommended by the auditor. Most of the master's expenses were allowed and paid as the proceedings progressed.

### FEES AND ALLOWANCES.

In the matter of fees and allowances, the court is confronted with a situation where the enormous sum of $470,000 has been asked, $297,450 of which is for attorneys' fees and $172,450 claimed by committees, individuals and institutions. The business of the estate was quite simple,—the operation of a toll bridge, which required some half dozen toll collectors (at salaries of $100 per month when the property was first taken over by the court, but which were increased from time to time until I believe they were receiving approximately $135 per month when it was reorganized), a superintendent and an assistant (whose salaries were about $2,500 and less than $2,000 a year, respectively, who received corresponding increases), and a president (who I believe was receiving $12,000 per year). The two trustees, during the administration, have been allowed sums exactly equaling the salary of

the president (except for one six-months' period, during which they were reduced), and their attorneys have been paid at the rate of $10,000 per year. Many important legal matters have arisen in the course of the administration of the estate, the improvements mentioned earlier in this opinion were made, requiring execution of contracts, etc., taxes were paid, insurance increased and kept up, but at considerably reduced rates, and the bridge kept painted. No complicated financial structure was involved. There were outstanding $5,000,000 of first mortgage bonds and $2,000,000 of debentures, and 60,000 shares of no par value common stock (for which nothing had been paid, except such value as the permit to construct the bridge across the Mississippi river possessed). In this situation, it should have been a comparatively easy matter to adjust the debtor's affairs, had there been a dispassionate approach to the problem.

In the first place, the original proceeding should never have been filed in the Western District of Louisiana, but in the Vicksburg Division of the Southern District of Mississippi, the place of business of the Bridge Company, where it was finally conducted and wound up. Just how much expense and time would have been saved in that way it is hard to tell, but I feel it might have been considerable. This, however, was a part of the strategy between the warring factions in the early stages. Up to that time, Bovay, promoter and President, and Shinners, Vice-President of the Bridge Company, and representative of one of the investment banks, who sold both classes of securities, had worked in comparative harmony, but once the litigation started, it was on fast and furious. Regardless of protestations of altruistic motives from either side, I am convinced that Shinners, in line with the activities of investment bankers of the past, set about to reorganize the property with the view of retaining control and as speedily as possible: while Bovay sought to thwart this purpose just as vigorously, influenced largely by his experience with Byllesby & Company, of which Shinners was Vice-President, in connection with the bridge at Cairo, Illinois, and his desire to have recognition for the common stock, about one-third of which he owned or controlled. I recognize the very plausible reason given by Shinners and his associates, that the investment banks having sold the securities, owed a duty to the holders to protect their interests, but at the same time I cannot lose sight of the human nature on either side. It is true that there were placed upon the Chicago Bondholders' Committee persons of prominence in financial and other circles, but I think it beyond question that it was the mind of Shinners which at all times dominated the course pursued. Neither can I shut my eyes to the fact that the Bogie Committee was the creature in a large measure of himself and associates, and although apparently separately represented in committee and counsel, in reality there was no distinction of purpose. When the matter was, in the fall of 1934, after enactment of section 77B, placed under its provisions and all issues properly concentrated in Vicksburg, it settled down to a tug of war between bonds and debentures, with Bovay hoping to save something for the stock, until he was told by the court that if he wished to continue to assert an interest in the estate because of his ownership of one-third of the stock, he would have to resign as trustee; that no one could object to his doing this from the outside, but he would not be permitted while serving as trustee to do anything prejudicial to security holders. He gave the court assurance that its directions would be carried out as the price of continuing as one of the trustees.

It does not appear, exactly, who started the movement at Vicksburg for the formation of a bondholders' committee but it was most actively sponsored from the beginning by Mr. Frank Andrews and others there. I believe the $198,000 of bonds which they represented were largely owned in that locality. Nor is it clear who was the moving spirit in starting a similar committee in New York, where $90,000 of bonds were in hand. In any event, the two committees soon consolidated, drawing together some, if not all, of the individual members of each, and the attorneys who represented both. While the controversy was going on between Shinners and Bovay, this group and their counsel were appearing and asserting their own views. It is stated in one or more of their verified applications that one of the controlling motives for forming this Bondholders' Committee was similar to that of Bovay, i. e., to keep the investment bankers from doing what had customarily been

done in the past,—"washing up the estate",—and again taking control. For these reasons, in those stages, both this group and the debentures, to the extent they were independently represented by Proctor, Fontaine and associates, were applauding assaults upon the Chicago Committee.

However, the record in this case will show that from the beginning and at the first hearing in Monroe, the court very clearly advised all concerned that if anyone figured to "make a killing out of the estate" they had best change their minds, for it intended, as far as it lay in its power, to see that the people whose money had been invested got what was coming to them. That assertion holds good to-day, just as it did then. The facts compel the court to say that the suggestions. which were finally worked into an acceptable plan were largely its own. The protection which has been thereby provided for both classes went as far as it was felt could be done without "wet-nursing" the beneficiaries of the plan indefinitely. The stock and bonds were tied together to prevent transfer of one without the other, so that one seeking control would have to pay what the equity represented by both was reasonably worth, subject, of course, to human misfortune or weakness. A trust period of five years was created to afford a reasonable time test and adjustment under the new management, with full power in the new security holders to see that the reorganized company is conducted economically, and if any advantage is taken for selfish ends by anyone, it will simply be due to the inertia of the security holders, against which no power can provide. At the same time, the debenture holders have been given representation in a manner which insures a watchdog at the council table, to see that earnings are properly devoted to payment of debts, to the end that if an equity for the stock is ultimately possible, it may be realized.

Based upon evidence which was taken by the master in Chicago in the fall of 1935, the Kansas City Debenture Committee made an assault upon the bonds because of alleged illegalities in organization of the debtor and the floating of its securities, having for its purpose the placing of both classes on the same basis with respect to rights in the property. This pleading remained undisposed of for sometime and when the Kansas City Committee joined the Bondholders' Committee in submitting the proposal of January, 1937, it was abandoned. However, the St. Louis group, and liquidator of Canal Bank, who sought to defeat that proposal, adopted all those grounds of attack, as well as many others, and the court was forced to try the same largely upon the record which had been made up in Chicago, and the questions of law arising in an attack upon the bond mortgage. Messrs. Engle, Levy and Wells represented the plaintiffs in that attack, and it was defended largely by the attorneys for the Chicago Bondholders' Committee, as well as by counsel for the bond mortgage trustees. The Kansas City Committee and its attorneys, of course, stood by while this was going on. The court having disposed of this matter adversely to the complainants in an extended opinion (see In re Vicksburg Bridge & Terminal Co., Inc., D.C., 22 F.Supp. at page 490), appeal was taken, but abandoned after the amended plan was accepted. This necessarily took lots of time and considerable work in arguing and briefing the subject by counsel for both sides.

The attorneys for the Chicago Bondholders' Committee appeared and joined vigorously with the attorneys for the Kansas City Debentureholders' Committee, in contesting the right of the St. Louis and New Orleans group to form a second debentures' committee, as well as in the hearings on the issue of solvency.

### Attorneys for the Chicago Bondholders' Committee.

The attorneys for this committee represented the major interest of bondholders (as they were destined to do under the circumstances) from the beginning, but a considerable part of their activities were in defending the tactics of the other groups which ran counter to the wishes of their clients and in prosecuting those of the latter. They rendered valuable services in defending the integrity of the bonds under the mortgage, in putting through the plan which was finally approved, and carrying the reorganization into effect. The reorganization, in the preparation of forms and papers, was handled largely by these attorneys and the committee which they represented. The debentures end was handled by the Kansas City Committee and its attorneys. An

extraordinarily long period of time had been required to bring the matter to a close, and a great volume of pleadings, proceedings and hearings were filed and had. Considering all of these, in connection with the benefits received by the estate from their services, amount involved and represented by this interest, I am of the opinion that for the entire services of counsel for the Chicago Bondholders' Committee, the sum of $55,000 would be ample.

### Attorneys for the New York-Vicksburg Committee.

The attorneys for this committee represented only a small minority interest, but they joined in the defense of the bondholders' rights and rendered some service in other ways, for which I think a fee of $15,000 should be allowed to Messrs. May & Bird and Lyell & Lyell of Jackson, Miss., and $5,000 to Coudert Brothers of New York. Esch and Sappinsley, for serving the same committee, should each receive $1,000, or a total of $22,000 for all legal services to the New York-Vicksburg Committee.

### Kansas City Debentures' Committee.

The Kansas City Debentureholders' Committee, while representing less than $100,000 in the beginning, took up and waged the fight for this class throughout the proceedings, and are due considerable credit for obtaining just consideration for debenture holders. The size of the expense claims of this committee and its counsel, when compared to those of other groups, illustrates rather forcefully the extent to which expenditures could be kept within reasonable bounds when governed by necessity. Their activities continued over the entire period and they attended all meetings and hearings of importance. They also handled the proceedings on behalf of debentures for putting into effect the final plan, and I think their attorneys are entitled to receive the sum of $30,000.

The condition which was created by the Bogie Committee, necessitating a change of depositaries, shifting and handling of a large block of these securities in the manner which was done, I think justified the employment of counsel by the First National Bank of Kansas City, depositary for the Kansas City Debentures' Committee, and an allowance of $1,000 will be made to Ryland Stinson, Mag & Thompson for that service.

### Claim of Engle, Levy & Wells.

The services of Messrs. Engle, Levy and Wells, in so far as benefits are concerned, came with the approval of the plan of reorganization, in helping to put it through and to expedite acceptance of the required percentages, and I think an allowance of $6,000 would be reasonable.

### Claim of Engle & Laub.

Engle & Laub asked for the sum of $10,000, for placing the Bridge Company in voluntary bankruptcy. This was simply another step in the strategy of Bovay in the early stages, and, but for the conclusion to consolidate both proceedings (voluntary and involuntary) and to carry the matter on under Section 77B of the Bankruptcy Act, after passage of that amendment, it is doubtful as to whether this voluntary adjudication could have been sustained. Mr. Engle and Messrs. Brunini & Hirsch were mainly responsible for bringing the original proceedings into the Western District of Louisiana, and were at those stages furthering the interest of Mr. Bovay, and I think a fee of $1,000 for this service is sufficient.

### Brunini & Hirsch.

Messrs. Brunini & Hirsch have asked compensation as attorneys for stockholders, and among other things offered in support of their claim the fact that they spent much time in studying, preparing for and in participating in the solvency hearing. This is true, as well as the fact that the hearing before the master went so long and covered so much irrelevant matter that the court had to threaten to tax costs against counsel participating therein to bring it to a conclusion. I think everyone recognized from the beginning that the bridge company was insolvent and nothing could be given to stockholders. The services of Messrs. Brunini & Hirsch were largely to Mr. Bovay personally, in pursuing the forlorn hope that some way might be found to award something to the old common stock. They were allowed and paid a fee of $10,000 when the receivership was ended and the proceedings placed under section 77B, and I think this is sufficient to cover any benefit to the estate which resulted from their services.

#### Flowers, Brown & Hester.

As previously pointed out, in connection with their claim for expenses, this firm first represented individual bondholders for a short while, and later, when Mr. Watkins was appointed one of the attorneys for the receivers and later for the trustees, Flowers, Brown & Hester succeeded to the representation of the corporation. With the election of the new board, control of the debtor passed into the hands of the Shinners group and its activities were, at all times, for the furtherance of that interest. This firm will be allowed the sum of $1,000.

#### Myer, Myer, Austin & Platte, and Green, Green & Jackson, Attorneys for Continental Illinois Bank & Trust Co., Trustee.

 For some unexplained reason, the Continental Illinois Bank & Trust Company, corporate trustee, and the individual trustee, Thomas W. McCoy, under the old bond mortgage, were separately represented by counsel, and for which separate fees have been asked. Their interests were common, i. e., the performance of their obligations under the trust indenture, and in the absence of some adverse position as between them, their duties were indivisible. They were bound to see that the rights of all bondholders were protected in the recognition of their lien and the taking of such other steps as were necessary to maintain their first position upon the assets of the debtor. This was done by filing, in the early stages of the proceedings, an application for foreclosure under the bond mortgage, the appointment of receivers and the consolidation of those proceedings with the general receivership. They also joined in the defense of the attack by the debenture holders and others upon the lien of the bonds and rendered substantial service in that way. Their attorneys, like all the rest, appeared whenever anything of consequence came up, but except as to these particular matters, were, like many others, on reference and in the battle between the factions which I have previously described, to some extent, on-lookers. I think a fee of $15,000 would be reasonable for their services. I am also of the view that an allowance of $1,000 will cover any additional service rendered by Mr. R. L. Dent in representing the individual trustee, T. W. McCoy.

### COMPENSATION TO COMMITTEE MEMBERS AND INDIVIDUALS.

#### The Chicago Bondholders' Committee.

The Chicago Bondholders' Committee, from the beginning, announced it would make no charge for the services of its members and none has been made.

 R. Miles Warner, as secretary of this Committee, has claimed $18,750 for his services. He did substantial work in keeping the records and handling the routine affairs of the Committee which represents the major bond interest, and I think $8,000 would be a proper allowance.

#### New York-Vicksburg Committee.

The New York-Vicksburg Committee, likewise in its "Plan of Reorganization as amended", dated September 1, 1934, declared: "No compensation shall be payable to the members of the reorganization committee or to the committee under the deposit agreement, dated as of Feb. 21, 1934, for their services hereunder or thereunder."

 This change from the deposit agreement of February 21, 1934, was occasioned by the fact, no doubt, that the Chicago Committee, in its proposal filed subsequently, had announced its intention to make no charge for services of its members, and the New York-Vicksburg Committee was anxious to compete on equal terms for deposits. Of course, it was not anticipated at that time that the proceedings would be so long drawn out, but a bargain is a bargain, and I think, having made it, this committee can no more renege than could the Chicago group. There was ample consideration for the promise, i. e., the hope of obtaining representation for bondholders, whether successful or not, and the amount actually deposited and represented is so small that any appreciable compensation to members of the committee would be out of all proportions thereto. However, I think the two secretaries of this committee are entitled to some compensation for the extra services they rendered and Messrs. Joseph M. Mulford, secretary to the New York division, and Frank Andrews, secretary to the Vicksburg office, will be allowed $2,500 each.

Continental Illinois Bank & Trust Company, Trustee, and Thomas W. McCoy, Individual Trustee under the Bond Mortgage.

██ The corporate and individual trustees under the old bond mortgage have asked for the sum of $10,000 and $2,500, respectively, for their services. They did little other than have their attorneys bring proceedings and participate in the case as heretofore described in connection with the latter's services, and I think a fee of $5,000 to the bank and $1,000 to the individual trustee would be ample.

### Brady, Hanser & Thompson.

██ Messrs. Brady, Hanser and Thompson have asked for the sum of $15,000, for their part in these proceedings. Work of obtaining the acceptance of the final plan by this group was done largely by Brady and Hanser, to whom I think an allowance of $1,000 each should be made and the sum of $500 to Thompson.

### Harry P. Schaub, F. A. Dunnagan and the Bogie Committee.

For reasons heretofore stated in the matter of expenses, no compensation will be allowed Messrs. Schaub, Dunnagan and the Bogie Committee.

### Kansas City Debentureholders' Committee.

The members of this committee, Messrs. C. L. Fontaine, Geo. H. Buecking, H. C. Cloudsley and C. K. Davis, have presented claims for compensation in the sum of $39,580. It has been brought to the attention of the court that, in a letter under date of October 17, 1934, this committee said: "This committee are not only serving without pay in any form, but are contributing to this cause sums equal to 1½% of the face value of their debentures. Their only purpose is to recover a substantial portion, if possible, of their investment."

It was thought by the auditor that this statement indicated a purpose to serve without pay, as had the two bondholders' committees, as pointed out above. However, in the form of receipt sent out by this committee on December 15, 1934, shortly following the above letter, it was stipulated: "It is understood and agreed that if a plan of reorganization shall be presented to and approved by the court, or in the absence of such presentation or approval, whenever the services of the committee shall be no further needed or required for the protection of the debenture holders, the committee will present to the court an application for an order to allow reasonable compensation for the services rendered and to be rendered by the committee, and a reasonable compensation for the services rendered and to be rendered by the attorneys, representatives and agents of the committee."

██ The expression first quoted appears as stated, in a letter in which the committee was attempting to get debenture holders to subscribe funds to pay expenses of carrying on the work of obtaining proper recognition of their rights, and, standing alone, might have been construed as evidencing a purpose to make no charge for services. However, within less than two months, any impression thus created in the minds of prospective depositors must necessarily have been dissipated by the terms of the proposed receipt sent to them. In the absence of the peculiar circumstances of this case, in which the two groups of bondholders, in competition with each other for representation, agreed to waive claims for compensation, it might seem inequitable to allow it to any one and not to the others; yet each had the right to propose its own terms as the price for representation, and the record speaks for itself as to what they did. Besides, as has been heretofore pointed out, the members of the Kansas City Debentures Committee carried the burden alone of an independent effort on behalf of this class for the greater part of the time involved in these proceedings, and were put to the necessity at one stage of obtaining from the court authority to borrow funds for that purpose. Considering the long fight which they made and the fact that they handled the ultimate consummation of the plan under the court's direction, I feel that a fair recompense for their services would be to allow Mr. Fontaine, chairman, who did the major portion of the work, the sum of $5,000 and the other four members $1,500 apiece, or a total of $11,000.

### H. C. McCabe, Special Master.

██ Finally as to the special master, Mr. H. C. McCabe. His services were rendered in conducting hearings upon the issues of solvency and of the right of the St. Louis group to form a new debentures committee, and other routine work of receiving and filing acceptances, or papers in connection with the two plans which were submitted. The court was compelled under circum-

stances which have been previously described to take over the determination of the matters submitted and to treat the references as a commission to the master for taking testimony. I believe that an allowance of $3,000 to the estate of Mr. McCabe, in addition to what has already been paid him for expenses and compensation, will reasonably cover the value of his services.

### Recapitulation of Allowances Tentatively Passed, is as follows:

#### Expenses.

| | |
|---|---|
| The Chicago Bondholders' Committee, their Secretary, Attorneys and Depositary | $45,187.09 |
| New York-Vicksburg Committee, its Secretary, attorneys and Depositary | 18,155.22 |
| Kansas City Debenture Holders' Committee, its Attorneys and Depositary | 10,710.89 |
| Brady, Hanser and Thompson | 674.52 |
| Engle, Wells and Levy | 366.04 |
| Continental Illinois Bank & Trust Co. | 1,484.86 |
| H. C. McCabe, Special Master | 37.73 |
| **Total Expenses** | **$ 76,616.35** |

#### Attorneys' Fees:

| | |
|---|---|
| Chicago Bondholders' Committee | $55,000.00 |
| New York-Vicksburg Bondholders' Com. | 22,000.00 |
| Kansas City Debenture Holders' Com. | 30,000.00 |
| Engle, Wells and Levy | 6,000.00 |
| Engle & Laub, for placing Debtor in bankruptcy | 1,000.00 |
| Flowers, Brown & Hester | 1,000.00 |
| Myer, Myer, Austin & Platte, and Green, Green & Jackson, Attorneys for Bond Trustee | 15,000.00 |
| R. L. Dent, attorney for Individual Bond Trustee | 1,000.00 |
| Ryland, Stinson, Mag and Thompson, Attorneys for First National Bank, Depositary for Debentures | 1,000.00 |
| **Total Attorneys' Fees** | **$132,000.00** |

#### Committees, Individuals and Institutions:

| | |
|---|---|
| Continental Illinois Bank & Trust Co. Bond Trustee | $ 5,000.00 |
| T. W. McCoy, Individual Trustee | 1,000.00 |
| R. Miles Warner, Secretary | 8,000.00 |
| Brady, Hanser & Thompson | 2,500.00 |
| Frank Andrews and J. M. Mulford, Sec'y. ($2,500.00 each) | 5,000.00 |
| Members Kansas City Debenture Com. | 11,000.00 |
| McCabe, Special Master | 3,000.00 |
| **Total to Committees, Individuals and Institutions** | **$ 35,500.00** |
| **Grand Total** | **$244,116.35** |

In thus handling the many claims for expenses and compensation, the awards have been made according to what I believed to be reasonably justified and commensurate with the contribution of each claimant to the solution of problems of the estate. I have also considered the qualifications of all persons, the skill required, and above all, the benefits to bondholders and debenture holders, owners of the equity, after payment of administration expenses, and believe my rulings are supported by the prior decisions. See Straus, et al. v. Baker et al., 5 Cir., 87 F.2d 401; In re Paramount-Publix Corp., 2 Cir., 85 F.2d 588, Id., D.C., 12 F.Supp. 823; In re New York Investors, Inc., 2 Cir., 79 F.2d 182; In re Consolidated Motor Parts, 2 Cir., 85 F.2d 579.

These tentative findings of fact and conclusions will be filed with the Clerk at Vicksburg, who is instructed to have copies hereof made and distributed to all persons who have made claims for fees and allowances. All claimants, as well as anyone having any interest whatsoever in this matter, will be allowed to file with the Clerk of this Court at Vicksburg, Mississippi, on or before October 15, 1938, exceptions and objections in writing hereto; and they will be further required to file therewith any additional affidavits or proofs which they may desire in support of or in opposition to any claim. Thereafter, and on October 20, 1938, a hearing will be had at Vicksburg, in open court, upon all of the said exceptions and objections.

### Supplemental Opinion

Pursuant to the tentative opinion handed down in this case on the 28th day of September, 1938, a hearing was had at Vicksburg on October 20, 1938, at which time all additional proofs, arguments, etc., were submitted in support of the several claims and exceptions to the findings in the tentative opinion.

Having given due consideration to all of these matters, disposition thereof is made as follows:

With respect to the claim for expenses of the Chicago Bondholders' Committee, while I am still of the opinion that the item of telephone and telegraph expenditures was occasioned in the manner and for the reasons stated in the tentative opinion, I have concluded that the proportion rejected was a little too drastic and the allowances will be increased to one-half of

the amount claimed or the sum of $3,058.59. This adds $1,019.53 to the allowance for telephone and telegraph claims.

(Mr. F. G. Hudson, Jr., one of the counsel for this committee, has in a letter called attention to the fact that the sum of $976.68 of telephone expenses claimed as having been incurred through the office of H. M. Byllesby & Company was eliminated "although the same is included in the aggregate deduction of $4.078.12, thereby making a net total of $36,731.79, when it should be $37,699.47". The item of $976.68 was eliminated, as stated, but then *added* to the total of expenditures for telephone and telegraph service by both this committee and its counsel before the deduction was made, and to allow it in the category requested, while at the same time including it in the aggregate, would be a duplication.)

It also appears from the representations of attorneys and members of the New York-Vicksburg Committee, as well as of the Kansas City Debenture Committee and its counsel, that the secretary of Mr. Hudson did perform services for all of them at the various hearings and conferences which would have cost, through the use of public stenographers, approximately as much as the item for traveling expenses disallowed, and this item will be restored, amounting to $432.85.

The court's attention has also been called to the fact that in disallowing overtime, it overlooked the fact that the work done during overtime would have had to be done at the regular rate on the day following, and from which it follows, notwithstanding the court's conclusion, to which it still adheres, that there was no necessity for rushing the work to the extent of incurring overtime prices, the claimants are entitled to be reimbursed at the normal rates, or on the basis of one-half of the amounts charged for overtime. This requires the allowance of one-half of the sum claimed as overtime for printing, etc., in August and November, 1934 ($566) or $283, and of a similar item on February 24, 1937 ($1,164.-18), amounting to $582.09, and making a total additional sum of $865.09.

Counsel for this committee has also called attention to the fact that it presented to the court, on May 23, 1938, an application for the appointment of the City National Bank of Chicago, as agent for the distribution of the bonds and securities of the new Company (other than debentures) in which it was specifically recited that the charges of this bank for said service would be the sum of $3,298.69, instead of $1,843.-10, allowed therefor in the tentative opinion, and upon which application the court entered an order authorizing the employment of the said Bank for said purposes. It is the view of the court that although not conclusively bound to recognize these charges as proper, since the Bank had already been engaged for a substantial period in performing said service before the application was made, nevertheless, in order to avoid any appearance of injustice, the claim to this extent will be recognized, which results in the restoration to this Bank of the sum of $1455.59.

The failure to allow this committee the fee claimed by Lambert & Heath, attorneys performing services for it in Washington, was purely an oversight, and the same will be added to the aggregate of the allowances.

Further consideration I think justifies increasing the fee to attorneys Oates, Hudson and Monroe, by the sum of $5,000.

The court is of the opinion that the allowance made to R. Miles Warner (erroneously referred to in the tentative opinion as a member of this committee), both for expenses and for compensation as secretary of this committee, were ample.

The other items disallowed or reduced from those claimed I think, after full consideration of the additional proofs, arguments and contentions, are fair and just and all other exceptions are, therefore, overruled.

The attorneys for this committee have called the attention of the court to certain inaccuracies in the tentative opinion, which are cheerfully corrected, as follows:

Messrs. Proctor and Fontaine, on behalf of the Debentureholders' Committee, first appeared in the case in August, 1934, instead of April of that year, as stated. However, this makes no appreciable difference and the court's views as to the matters referred remain the same. The Chicago Bondholders' Committee did not actually solicit the deposit of any bonds until after its deposit agreement had been approved, but some of its members purchased several thousand dollars worth of these securities. However, it did circularize the bondholders to prevent them from depositing with any other committee. The reason it did not solicit was because it had not qualified with the Trade Commission, as had the New York-Vicksburg Committee

and expected to receive its authority from the court, which would exempt the Chicago Committee from the necessity of qualifying with the Commission.

### New York-Vicksburg Bondholders' Committee.

The same rule will be applied to this committee as to the Chicago Bondholders' Committee, with respect to the claim for telephone and telegraph expenditures, by the allowance of one-half instead of one-third of that item ($2,563.09), which results in an increase of $427.18.

Additional proofs tend to support the conclusion that an item of $360 disallowed "for work done by the regular force of Coudert Bros." was done for L. S. Carter, one of the members of the committee, under circumstances justifying its allowance to the committee and this item will be restored.

The disallowance for overtime is also subject to the same correction as was made as to the other committee, i. e., instead of excluding the entire amount, one-half should have been allowed on the basis of regular day rates, which adds the sum of $544.18.

Counsel for this committee has brought to the attention of the court that Mr. Joseph M. Mulford acted as New York secretary for only about one-fourth of the time and is not entitled to equal consideration with Mr. Frank H. Andrews, the Vicksburg secretary. The amount awarded Mr. Mulford will, therefore, be reduced to $1,500. It has also been disclosed that more extensive services were performed by Mr. Andrews than appeared from the record, and his allowance will be increased to the sum of $5,000, which has the effect of adding the sum of $1,500 to the total of secretarial service for this committee.

Upon further consideration, I have decided to allow the interest upon the loan to this committee ($25,000) aggregating ($3,750.24 plus $296.11) $4,046.35, as an expense incident to the services rendered by it.

I am also convinced that the allowance to Coudert Bros. should be increased from $5,000 to $8,000, thereby adding $3,000 to the compensation for attorneys for this committee.

All other exceptions on the part of this committee, its members and attorneys, will be overruled.

### Kansas City Debentureholders' Committee.

This committee should also be allowed the interest on the loan for expenses, in the sum of $108.06.

Mr. C. L. Fontaine, it appears, acted both as secretary and chairman to this committee. No allowance was made him for the clerical or secretarial services and I think an additional sum of $2,000 should be awarded for that reason.

I am also of the view that the fee to Messrs. Proctor, Blackmar and Munholland should be increased by the sum of $3,000, making a total to them of $33,000.

### Continental Illinois Bank & Trust Company, Trustee.

Since handing down the tentative opinion in this case, this claimant has presented detailed data, and there has been audited the item of $649.45, which was eliminated because of the failure to furnish itemized figures as to what it included. The auditor has applied the rule used in all other instances of traveling expenses, etc., with the result as follows:

| Mr. Herbert Becker, Attorney | | Claimed | Recommended |
|---|---|---|---|
| 4/1– 5'34 Chicago to Jackson, Miss. | | $155.40 | $ 84.13 |
| 4/8–13'34 " to Monroe, La. | | 257.02 | 94.48 |
| 6/8– 9'34 " to Alexandria, La. | | 171.30 | 85.00 |
| Telephone and Telegraph | | 50.29 | 50.29 |
| Totals | | $634.01 | $313.90 |

Under date Oct. 14th and 20th, 1938, traveling expenses are also claimed and the auditor has made recommendations as follows:

| Mayer, Meyer, Austrian & Platt: | Claimed | Recommended |
|---|---|---|
| Traveling expenses—Becker | $209.95 | $155.76 |
| Telephone & Telegraph | 4.13 | 4.13 |
| Totals | $214.08 | $159.89 |

| Green, Green & Jackson: | Claimed | Recommended |
|---|---|---|
| Traveling Expenses | $24.85 | $24.85 |
| Telephone & Telegraph | $45.29 | $45.29 |
| | $70.14 | $70.14 |

The amount recommended will be allowed.

### Expenses of Engle, Wells and Levy, Attorneys.

Upon further consideration, I am convinced that it would be proper to allow Messrs. Engle, Wells and Levy their rea-

sonable expenses, beginning with the hearing upon the issue of solvency on April 2, 1937. Independently of the unauthorized attempted representation of debenture holders in the St. Louis area, they were attorneys for the Canal Bank & Trust Company in liquidation, and of the R. F. C. and it was necessary that this element of the debentures should participate in the proceedings to fix the value of the property. This justifies allowance of additional amounts as follows:

| | |
|---|---:|
| Engle | $309.80 |
| Wells | 328.86 |
| Levy | 232.38 |
| Total | $871.04 |

For the services rendered in the solvency hearing I think these attorneys together should be allowed the additional sum of $4,000.

For the same reasons as applied to the attorneys for this group, Messrs. Hanser and Brady will be allowed expenses from the beginning of the solvency hearing and which results in an additional $198.45 to Hanser and $191.55 to Brady, or a total of $389.

### Engle & Laub.
### For Filing Voluntary Application in Bankruptcy.

This matter, I think, was correctly disposed of for the reasons stated in the tentative opinion, and nothing additional will be allowed.

### Brunini & Hirsch.
### For Stockholders.

■ Upon further consideration of the claim of Brunini & Hirsch, for compensation as attorneys in representing the stockholders at the solvency hearing, it would appear that some allowance should be made to this firm for the services mentioned. Stockholders were indispensable parties to that proceeding and they were entitled to representation by counsel. The work of this firm aided to some extent in developing the facts, which the court, in connection with the report of the engineers, considered in fixing the value that resulted in the exclusion of stockholders from participation. I think a reasonable fee for this service is the sum of $2,000, which will be allowed.

■ Exception was taken to the statement of the court in its tentative opinion that this firm had been allowed $10,000 in the receivership proceedings. It has been pointed out

that since there were four law firms participating therein, each only received the sum of $2,500. Of course the allowance cannot be gauged by the number of counsel involved, but the court must allow what the service is reasonably worth, regardless of the number of attorneys. The court did not follow up or understand what division was made of the fee.

### Flowers, Brown & Hester.

■ We have the somewhat unusual situation as reflected by the claim of Engle & Laub for placing the old corporation in voluntary bankruptcy, and of the firm of Flowers, Brown & Hester for representing the same entity in the other proceedings. This came about as a result of the "jockeying" of the Bovay and Shinners interests in the early stages, as pointed out in the tentative opinion. Bovay had control of the board of directors when the application for receiver was filed, January 30, 1934, and for that reason his individual attorneys, Brunini & Hirsch and Engle & Laub, represented him. However, shortly after the litigation started, the annual stockholders' meeting was held and Shinners and his associates, having control of a majority of the stock, ousted Bovay and the directors friendly to him, and selected others of their own, under whose authority Mr. W. H. Watkins was first employed to appear for the corporation and later the firm of Flowers, Brown & Hester, as set forth in the tentative opinion. From the beginning, the Chicago group took the position that the stock was worthless and that the debentures were entitled to only slight participation. Thereafter, representation of the corporation was simply for nominal and technical purposes. If the last mentioned firm represented bondholders in the beginning, it simply emphasizes the multiplicity of counsel employed in the case and I think the persons undertaking the employment should reimburse the attorneys who thus served them, rather than the estate.

### Travis Oliver.

In the tentative opinion the court overlooked entirely the proof of expenses incurred by Mr. Travis Oliver, who had been appointed as a special representative for the benefit of debentureholders after the death of Mr. Claiborne and the decision to deny the St. Louis and New Orleans group authority to form a second debentures' committee.

■ Mr. Oliver made trips to Jackson, Vicksburg and New Orleans, in an attempt to work out with the Highway Commissions of the States of Mississippi. and Louisiana a sale of the bridge at a figure which would have paid off the bondholders and provided a substantial portion of their investment to debenture holders, but was not successful. He incurred expenses in the sum of $41.95, and for this service I think an allowance of $500 should be made in addition to the expenses, which adds the sum of $541.95 to the aggregate of expenses.

■ The expenses of all exceptors and their attorneys appearing at the hearing on October 20, 1938, will be allowed and the trustees will be directed to pay the same upon the filing of itemized statements thereof and auditing by the accountant, under the rules applied in other instances.

All other exceptions and objections not specially mentioned herein are overruled.

Allowances for expenses and fees as finally determined, are authorized to be paid by the trustees, out of the funds remaining in their hands, as follows:

### Expenses:

| | |
|---|---|
| Chicago Bondholders' Committee, its Secretary, Attorneys and Depository | $ 49,455.15 |
| New York-Vicksburg Committee, its Secretaries and Depository | 23,532.93 |
| Kansas City Debentureholders' Committee | 10,720.89 |
| Brady, Hanser & Thompson | 1,063.52 |
| Engle, Wells and Levy | 1,237.08 |
| Travis Oliver | 41.95 |
| Continental Illinois Bank & Trust Co. | 2,044.23 |
| H. C. McCabe, Special Master | 37.73 |
| | |
| Total Expenses | $ 88,133.48 |

### Attorneys' Fees:

| | |
|---|---|
| Chicago Bondholders' Committee | $ 60,000.00 |
| New York-Vicksburg Bondholders' Committee | 26,000.00 |
| Kansas City Debentureholders' Committee | 33,000.00 |
| Engle, Wells and Levy | 10,000.00 |
| Engle & Laub, for placing debtor in bankruptcy | 1,000.00 |
| Flowers, Brown & Hester | 1,000.00 |
| Meyer, Meyer, Austrian & Platt and Green, Green & Jackson, attorneys for Bond Trustee | 15,000.00 |
| R. L. Dent, Attorney for Individual Trustee | 1,000.00 |
| Ryland, Stinson, May & Thompson, Attorneys for First National Bank, Depository for Debentures | 1,000.00 |
| Brunini & Hirsch Attorneys for Stockholders | 2,000.00 |
| | |
| Total | $150,000.00 |

### Committees, Individuals and Institutions:

| | |
|---|---|
| Continental Illinois Bank & Trust Co., Bond Trustee | $ 5,000.00 |
| T. W. McCoy, Individual Trustee | 2,000.00 |
| R. Miles Warner, Secretary | 8,000.00 |
| Brady, Hanser & Thompson | 2,500.00 |
| Frank H. Andrews, Vicksburg Secretary New York-Vicksburg Committee | 5,000.00 |
| Joseph M. Mulford, New York Secretary for same Committee | 1,500.00 |
| C. L. Fontaine, Chairman and Secretary Kansas City Debentures' Committee | 7,000.00 |
| All other members same Committee in the aggregate | 6,000.00 |
| H. C. McCabe, Special Master | 3,000.00 |
| Travis Oliver | 500.00 |
| | |
| Total | $ 40,500.00 |

### Recapitulation:

| | |
|---|---|
| Expenses | $ 88,133.48 |
| Attorneys' Fees | 150,000.00 |
| To Committees, Individuals and Institutions | 40,500.00 |
| | |
| Grand Total | $278,633.48 |